## BOGGS *v.* BOGGS ET AL.

No. 96–79.  Argued January 15, 1997—Decided June 2, 1997

834

*Marian Mysing Livaudais* argued the cause for petitioner. With her on the briefs were *John Catlett Christian, F. Pierre Livaudais,* and *James F. Willeford.*

*Paul R. Q. Wolfson* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Dellinger, Deputy Solicitor General Kneedler, J. Davitt McAteer, Allen H. Feldman, Nathaniel I. Spiller,* and *Judith D. Heimlich.*

*Edward J. Deano, Jr.,* argued the cause for respondents. With him on the brief were *Guy L. Deano, Jr.,* and *Theresa D. Bewig.\**

JUSTICE KENNEDY delivered the opinion of the Court.†

We consider whether the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 832, as amended, 29 U. S. C. § 1001 *et seq.,* pre-empts a state law allowing a non-

---

*Briefs of *amici curiae* urging reversal were filed for the American Association of Retired Persons by *Mary Ellen Signorille, Cathy Ventrell-Monsees,* and *Melvin Radowitz;* and for the Employers Council on Flexible Compensation by *Daniel B. Stone.*

*Richard P. Ieyoub,* Attorney General of Louisiana, *Thomas S. Halligan,* Assistant Attorney General, *William A. Reppy, Jr.,* and *Cynthia A. Samuel* filed a brief for the State of Louisiana as *amicus curiae* urging affirmance.

*Robert E. Temmerman, Jr., Keith P. Bartel, Randolph B. Godshall,* and *Michael J. Jones* filed a brief for the Estate Planning, Trust and Probate Law Section of the State Bar of California as *amicus curiae.*

†THE CHIEF JUSTICE and JUSTICE GINSBURG join Part III of this opinion.

participant spouse to transfer by testamentary instrument an interest in undistributed pension plan benefits. Given the pervasive significance of pension plans in the national economy, the congressional mandate for their uniform and comprehensive regulation, and the fundamental importance of community property law in defining the marital partnership in a number of States, the question is of undoubted importance. We hold that ERISA pre-empts the state law.

## I

Isaac Boggs worked for South Central Bell from 1949 until his retirement in 1985. Isaac and Dorothy, his first wife, were married when he began working for the company, and they remained husband and wife until Dorothy's death in 1979. They had three sons. Within a year of Dorothy's death, Isaac married Sandra, and they remained married until his death in 1989.

Upon retirement, Isaac received various benefits from his employer's retirement plans. One was a lump-sum distribution from the Bell System Savings Plan for Salaried Employees (Savings Plan) of $151,628.94, which he rolled over into an Individual Retirement Account (IRA). He made no withdrawals and the account was worth $180,778.05 when he died. He also received 96 shares of AT&T stock from the Bell South Employee Stock Ownership Plan (ESOP). In addition, Isaac enjoyed a monthly annuity payment during his retirement of $1,777.67 from the Bell South Service Retirement Program.

The instant dispute over ownership of the benefits is between Sandra (the surviving wife) and the sons of the first marriage. The sons' claim to a portion of the benefits is based on Dorothy's will. Dorothy bequeathed to Isaac one-third of her estate, and a lifetime usufruct in the remaining two-thirds. A lifetime usufruct is the rough equivalent of a common-law life estate. See La. Civ. Code Ann., Art. 535 (West 1980). She bequeathed to her sons the naked owner-

ship in the remaining two-thirds, subject to Isaac's usufruct. All agree that, absent pre-emption, Louisiana law controls and that under it Dorothy's will would dispose of her community property interest in Isaac's undistributed pension plan benefits. A Louisiana state court, in a 1980 order entitled "Judgment of Possession," ascribed to Dorothy's estate a community property interest in Isaac's Savings Plan account valued at the time at $21,194.29.

Sandra contests the validity of Dorothy's 1980 testamentary transfer, basing her claim to those benefits on her interest under Isaac's will and 29 U. S. C. § 1055. Isaac bequeathed to Sandra outright certain real property including the family home. His will also gave Sandra a lifetime usufruct in the remainder of his estate, with the naked ownership interest being held by the sons. Sandra argues that the sons' competing claim, since it is based on Dorothy's 1980 purported testamentary transfer of her community property interest in undistributed pension plan benefits, is pre-empted by ERISA. The Bell South Service Retirement Program monthly annuity is now paid to Sandra as the surviving spouse.

After Isaac's death, two of the sons filed an action in state court requesting the appointment of an expert to compute the percentage of the retirement benefits they would be entitled to as a result of Dorothy's attempted testamentary transfer. They further sought a judgment awarding them a portion of: the IRA; the ESOP shares of AT&T stock; the monthly annuity payments received by Isaac during his retirement; and Sandra's survivor annuity payments, both received and payable.

In response, Sandra Boggs filed a complaint in the United States District Court for the Eastern District of Louisiana, seeking a declaratory judgment that ERISA pre-empts the application of Louisiana's community property and succession laws to the extent they recognize the sons' claim to an interest in the disputed retirement benefits. The District

Court granted summary judgment against Sandra Boggs. 849 F. Supp. 462 (1994). It found that, under Louisiana community property law, Dorothy had an ownership interest in her husband's pension plan benefits built up during their marriage. The creation of this interest, the court explained, does not violate 29 U. S. C. § 1056(d)(1), which prohibits pension plan benefits from being "assigned" or "alienated," since Congress did not intend to alter traditional familial and support obligations. In the court's view, there was no assignment or alienation because Dorothy's rights in the benefits were acquired by operation of community property law and not by transfer from Isaac. Turning to Dorothy's testamentary transfer, the court found it effective because "[ERISA] does not display any particular interest in preserving maximum benefits to any particular beneficiary." 849 F. Supp., at 465.

A divided panel of the Fifth Circuit affirmed. 82 F. 3d 90 (1996). The court stressed that Louisiana law affects only what a plan participant may do with his or her benefits after they are received and not the relationship between the pension plan administrator and the plan beneficiary. *Id.*, at 96. For the reasons given by the District Court, it found ERISA's pension plan anti-alienation provision, § 1056(d)(1), inapplicable to Louisiana's creation of Dorothy Boggs' community property interest in the pension plan benefits. It concluded that the transfer of the interest from Dorothy to her sons was not a prohibited assignment or alienation, as this transfer was "two steps removed from the disbursement of benefits." *Id.*, at 97.

Six members of the Court of Appeals dissented from the failure to grant rehearing en banc. 89 F. 3d 1169 (1996). In their view, a testamentary transfer of an interest in undistributed retirement benefits frustrates ERISA's goals of securing national uniformity in pension plan administration and of ensuring that retirees, and their dependents, are the actual recipients of retirement income. They believed that

Congress' creation of the qualified domestic relations order (QDRO) mechanism in § 1056(d)(3), whose requirements were not met by the 1980 judgment of possession, further supported their position. (A QDRO is a limited exception to the pension plan anti-alienation provision and allows courts to recognize a nonparticipant spouse's community property interest in pension plans under specific circumstances.)

The reasoning and holding of the Fifth Circuit's decision is in substantial conflict with the decision of the Court of Appeals for the Ninth Circuit in *Ablamis* v. *Roper,* 937 F. 2d 1450 (1991), which held that ERISA pre-empts a testamentary transfer by a nonparticipant spouse of her community property interest in undistributed pension plan benefits. The division between the Circuits is significant, for the Fifth Circuit has jurisdiction over the community property States of Louisiana and Texas, while the Ninth Circuit includes the community property States of Arizona, California, Idaho, Nevada, and Washington. Having granted certiorari to resolve the issue, 519 U. S. 957 (1996), we now reverse.

## II

ERISA pre-emption questions are recurrent, two other cases on the subject having come before the Court in the current Term alone, see *California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.,* 519 U. S. 316 (1997); *De Buono* v. *NYSA–ILA Medical and Clinical Services Fund, ante,* p. 806. In large part the number of ERISA pre-emption cases reflects the comprehensive nature of the statute, the centrality of pension and welfare plans in the national economy, and their importance to the financial security of the Nation's work force. ERISA is designed to ensure the proper administration of pension and welfare plans, both during the years of the employee's active service and in his or her retirement years.

This case lies at the intersection of ERISA pension law and state community property law. None can dispute the

central role community property laws play in the nine community property States. It is more than a property regime. It is a commitment to the equality of husband and wife and reflects the real partnership inherent in the marital relationship. State community property laws, many of ancient lineage, "must have continued to exist through such lengths of time because of their manifold excellences and are not lightly to be abrogated or tossed aside." 1 W. de Funiak, Principles of Community Property 11 (1943). The community property regime in Louisiana dates from 1808 when the territorial legislature of Orleans drafted a civil code that adopted Spanish principles of community property. *Id.*, at 85–89. Louisiana's community property laws, and the community property regimes enacted in other States, implement policies and values lying within the traditional domain of the States. These considerations inform our pre-emption analysis. See *Hisquierdo* v. *Hisquierdo*, 439 U. S. 572, 581 (1979).

The nine community property States have some 80 million residents, with perhaps $1 trillion in retirement plans. See Brief for Estate Planning, Trust and Probate Law Section of the State Bar of California as *Amicus Curiae* 1. This case involves a community property claim, but our ruling will affect as well the right to make claims or assert interests based on the law of any State, whether or not it recognizes community property. Our ruling must be consistent with the congressional scheme to assure the security of plan participants and their families in every State. In enacting ERISA, Congress noted the importance of pension plans in its findings and declaration of policy, explaining:

> "[T]he growth in size, scope, and numbers of employee benefit plans in recent years has been rapid and substantial; . . . the continued well-being and security of millions of employees and their dependents are directly affected by these plans; . . . they are affected with a national public interest [and] they have become an important factor affecting the stability of employment and

the successful development of industrial relations . . . ."
29 U. S. C. § 1001(a).

ERISA is an intricate, comprehensive statute. Its federal regulatory scheme governs employee benefit plans, which include both pension and welfare plans. All employee benefit plans must conform to various reporting, disclosure, and fiduciary requirements, see §§ 1021–1031, 1101–1114, while pension plans must also comply with participation, vesting, and funding requirements, see §§ 1051–1086. The surviving spouse annuity and QDRO provisions, central to the dispute here, are part of the statute's mandatory participation and vesting requirements. These provisions provide detailed protections to spouses of plan participants which, in some cases, exceed what their rights would be were community property law the sole measure.

ERISA's express pre-emption clause states that the Act "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." § 1144(a). We can begin, and in this case end, the analysis by simply asking if state law conflicts with the provisions of ERISA or operates to frustrate its objects. We hold that there is a conflict, which suffices to resolve the case. We need not inquire whether the statutory phrase "relate to" provides further and additional support for the pre-emption claim. Nor need we consider the applicability of field pre-emption, see *Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta*, 458 U. S. 141, 153 (1982).

We first address the survivor's annuity and then turn to the other pension benefits.

## III

Sandra Boggs, as we have observed, asserts that federal law pre-empts and supersedes state law and requires the surviving spouse annuity to be paid to her as the sole beneficiary. We agree.

The annuity at issue is a qualified joint and survivor annuity mandated by ERISA. Section 1055(a) provides:

> "Each pension plan to which this section applies shall provide that—
> "(1) in the case of a vested participant who does not die before the annuity starting date, the accrued benefit payable to such participant shall be provided in the form of a qualified joint and survivor annuity."

ERISA requires that every qualified joint and survivor annuity include an annuity payable to a nonparticipant surviving spouse. The survivor's annuity may not be less than 50% of the amount of the annuity which is payable during the joint lives of the participant and spouse. § 1055(d)(1). Provision of the survivor's annuity may not be waived by the participant, absent certain limited circumstances, unless the spouse consents in writing to the designation of another beneficiary, which designation also cannot be changed without further spousal consent, witnessed by a plan representative or notary public. § 1055(c)(2). Sandra Boggs, as the surviving spouse, is entitled to a survivor's annuity under these provisions. She has not waived her right to the survivor's annuity, let alone consented to having the sons designated as the beneficiaries.

Respondents say their state-law claims are consistent with these provisions. Their claims, they argue, affect only the disposition of plan proceeds after they have been disbursed by the Bell South Service Retirement Program, and thus nothing is required of the plan. ERISA's concern for securing national uniformity in the administration of employee benefit plans, in their view, is not implicated. They argue Sandra's community property obligations, after she receives the survivor annuity payments, "fai[l] to implicate the regulatory concerns of ERISA." *Fort Halifax Packing Co.* v. *Coyne*, 482 U. S. 1, 15 (1987).

We disagree. The statutory object of the qualified joint and survivor annuity provisions, along with the rest of § 1055, is to ensure a stream of income to surviving spouses. Section 1055 mandates a survivor's annuity not only where a participant dies after the annuity starting date but also guarantees one if the participant dies before then. See §§ 1055(a)(2), (e). These provisions, enacted as part of the Retirement Equity Act of 1984 (REA), Pub. L. 98–397, 98 Stat. 1426, enlarged ERISA's protection of surviving spouses in significant respects. Before REA, ERISA only required that pension plans, if they provided for the payment of benefits in the form of an annuity, offer a qualified joint and survivor annuity as an option entirely within a participant's discretion. 29 U. S. C. §§ 1055(a), (e) (1982 ed.). REA modified ERISA to permit participants to designate a beneficiary for the survivor's annuity, other than the nonparticipant spouse, only when the spouse agrees. § 1055(c)(2). Congress' concern for surviving spouses is also evident from the expansive coverage of § 1055, as amended by REA. Section 1055's requirements, as a general matter, apply to all "individual account plans" and "defined benefit plans." § 1055(b)(1). The terms are defined, for § 1055 purposes, so that all pension plans fall within those two categories. See § 1002(35). While some individual account plans escape § 1055's surviving spouse annuity requirements under certain conditions, Congress still protects the interests of the surviving spouse by requiring those plans to pay the spouse the nonforfeitable accrued benefits, reduced by certain security interests, in a lump-sum payment. § 1055(b)(1)(C).

ERISA's solicitude for the economic security of surviving spouses would be undermined by allowing a predeceasing spouse's heirs and legatees to have a community property interest in the survivor's annuity. Even a plan participant cannot defeat a nonparticipant surviving spouse's statutory entitlement to an annuity. It would be odd, to say the least, if Congress permitted a predeceasing nonparticipant spouse

to do so. Nothing in the language of ERISA supports concluding that Congress made such an inexplicable decision. Testamentary transfers could reduce a surviving spouse's guaranteed annuity below the minimum set by ERISA (defined as 50% of the annuity payable during the joint lives of the participant and spouse). In this case, Sandra's annuity would be reduced by approximately 20%, according to the calculations contained in the sons' state-court filings. There is no reason why testamentary transfers could not reduce a survivor's annuity by an even greater amount. Perhaps even more troubling, the recipient of the testamentary transfer need not be a family member. For instance, a surviving spouse's § 1055 annuity might be substantially reduced so that funds could be diverted to support an unrelated stranger.

In the face of this direct clash between state law and the provisions and objectives of ERISA, the state law cannot stand. Conventional conflict pre-emption principles require pre-emption "where compliance with both federal and state regulations is a physical impossibility, . . . or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade* v. *National Solid Wastes Management Assn.*, 505 U. S. 88, 98 (1992) (internal quotation marks and citation omitted). It would undermine the purpose of ERISA's mandated survivor's annuity to allow Dorothy, the predeceasing spouse, by her testamentary transfer to defeat in part Sandra's entitlement to the annuity § 1055 guarantees her as the surviving spouse. This cannot be. States are not free to change ERISA's structure and balance.

Louisiana law, to the extent it provides the sons with a right to a portion of Sandra Boggs' § 1055 survivor's annuity, is pre-empted.

## IV

Beyond seeking a portion of the survivor's annuity, respondents claim a percentage of: the monthly annuity pay-

ments made to Isaac Boggs during his retirement; the IRA; and the ESOP shares of AT&T stock. As before, the claim is based on Dorothy Boggs' attempted testamentary transfer to the sons of her community property interest in Isaac's undistributed pension plan benefits. Respondents argue further—and somewhat inconsistently—that their claim again concerns only what a plan participant or beneficiary may do once plan funds are distributed, without imposing any obligations on the plan itself. Both parties agree that the ERISA benefits at issue here were paid after Dorothy's death, and thus this case does not present the question whether ERISA would permit a nonparticipant spouse to obtain a devisable community property interest in benefits paid out during the existence of the community between the participant and that spouse.

A brief overview of ERISA's design is necessary to put respondents' contentions in the proper context. The principal object of the statute is to protect plan participants and beneficiaries. See *Shaw* v. *Delta Air Lines, Inc.,* 463 U. S. 85, 90 (1983) ("ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans"). Section 1001(b) states that the policy of ERISA is "to protect . . . the interests of participants in employee benefit plans and their beneficiaries." Section 1001(c) explains that ERISA contains certain safeguards and protections which help guarantee the "equitable character and the soundness of [private pension] plans" in order to protect "the interests of participants in private pension plans and their beneficiaries." The general policy is implemented by ERISA's specific provisions. Apart from a few enumerated exceptions, a plan fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." § 1104(a)(1). The assets of a plan, again with certain exceptions, are "held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of

administering the plan." §1103(c)(1). The Secretary of Labor has authority to create exemptions to ERISA's prohibition on certain plan holdings, acquisitions, and transactions, but only if doing so is in the interests of the plan's "participants and beneficiaries." §1108(a)(2). Persons with an interest in a pension plan may bring a civil suit under ERISA's enforcement provisions only if they are either a participant or beneficiary. Section 1132(a)(1)(B), for instance, provides that a civil action may be brought "by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

ERISA confers beneficiary status on a nonparticipant spouse or dependent in only narrow circumstances delineated by its provisions. For example, as we have discussed, §1055(a) requires provision of a surviving spouse annuity in covered pension plans, and, as a consequence, the spouse is a beneficiary to this extent. Section 1056's QDRO provisions likewise recognize certain pension plan community property interests of nonparticipant spouses and dependents. A QDRO is a type of domestic relations order that creates or recognizes an alternate payee's right to, or assigns to an alternate payee the right to, a portion of the benefits payable with respect to a participant under a plan. §1056(d)(3)(B)(i). A domestic relations order, in turn, is any judgment, decree, or order that concerns "the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant" and is "made pursuant to a State domestic relations law (including a community property law)." §1056(d)(3)(B)(ii). A domestic relations order must meet certain requirements to qualify as a QDRO. See §§1056(d)(3)(C)–(E). QDRO's, unlike domestic relations orders in general, are exempt from both the pension plan anti-alienation provision, §1056(d)(3)(A), and ERISA's general pre-emption clause,

§ 1144(b)(7). In creating the QDRO mechanism Congress was careful to provide that the alternate payee, the "spouse, former spouse, child, or other dependent of a participant," is to be considered a plan beneficiary. §§ 1056(d)(3)(K), (J). These provisions are essential to one of REA's central purposes, which is to give enhanced protection to the spouse and dependent children in the event of divorce or separation, and in the event of death the surviving spouse. Apart from these detailed provisions, ERISA does not confer beneficiary status on nonparticipants by reason of their marital or dependent status.

Even outside the pension plan context and its anti-alienation restriction, Congress deemed it necessary to enact detailed provisions in order to protect a dependent's interest in a welfare benefit plan. Through a § 1169 "qualified medical child support order" a child's interest in his or her parent's group health care plan can be enforced. A "medical child support order" is defined as any judgment, decree, or order that concerns the provision of child support "made pursuant to a State domestic relations law (including a community property law) and relates to benefits under such plan." § 1169(a)(2)(B)(i). As with a QDRO, a "medical child support order" must satisfy certain criteria in order to qualify. See §§ 1169(a)(3)–(4). In accordance with ERISA's care in conforming entitlements to benefits with participant or beneficiary status, the statute treats a child subject to such a qualifying order as a participant for ERISA's reporting and disclosure requirements and as a beneficiary for other purposes. § 1169(a)(7).

The surviving spouse annuity and QDRO provisions, which acknowledge and protect specific pension plan community property interests, give rise to the strong implication that other community property claims are not consistent with the statutory scheme. ERISA's silence with respect to the right of a nonparticipant spouse to control pension plan benefits by testamentary transfer provides powerful support

for the conclusion that the right does not exist. Cf. *Massachusetts Mut. Life Ins. Co.* v. *Russell*, 473 U. S. 134, 147–148 (1985). It should cause little surprise that Congress chose to protect the community property interests of separated and divorced spouses and their children, a traditional subject of domestic relations law, but not to accommodate testamentary transfers of pension plan benefits. As a general matter, "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." *In re Burrus*, 136 U. S. 586, 593–594 (1890). Support obligations, in particular, are "deeply rooted moral responsibilities" that Congress is unlikely to have intended to intrude upon. See *Rose* v. *Rose*, 481 U. S. 619, 632 (1987); see also *id.*, at 636–640 (O'CONNOR, J., concurring). In accord with these principles, Congress ensured that state domestic relations orders, as long as they meet certain statutory requirements, are not pre-empted.

We conclude the sons have no claim under ERISA to a share of the retirement benefits. To begin with, the sons are neither participants nor beneficiaries. A "participant" is defined as an "employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit." § 1002(7). A "beneficiary" is a "person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." § 1002(8). Respondents' claims are based on Dorothy Boggs' attempted testamentary transfer, not on a designation by Isaac Boggs or under the terms of the retirement plans. They do not even attempt to argue that they are beneficiaries by virtue of the judgment of possession qualifying as a QDRO.

An *amicus*, the Estate Planning, Trust and Probate Law Section of the State Bar of California, in support of respondents' position, points to pre-REA case law holding that

ERISA does not pre-empt spousal community property interests in pension benefits, regardless of who is the plan participant or beneficiary. As did the District Court below, the *amicus* relies in particular upon *In re Marriage of Campa*, 89 Cal. App. 3d 113, 152 Cal. Rptr. 362 (1979), in which the California Court of Appeal for the First District held that ERISA does not bar California courts from joining pension funds in marriage dissolution proceedings and ordering the pension plan to divide pension payments between the employee and his or her former nonparticipant spouse. We dismissed the pension plan's appeal for want of a substantial federal question, 444 U. S. 1028 (1980), and, although not entitled to full precedential weight, see *Edelman* v. *Jordan*, 415 U. S. 651, 670–671 (1974), that disposition constitutes a decision on the merits, see *Hicks* v. *Miranda*, 422 U. S. 332, 344 (1975). The state court in *Marriage of Campa* was not alone in refusing to find ERISA pre-emption in the divorce context. See, *e. g., Stone* v. *Stone,* 450 F. Supp. 919 (ND Cal. 1978), aff'd, 632 F. 2d 740 (CA9 1980), cert. denied, 453 U. S. 922 (1981); *Savings and Profit Sharing Fund of Sears Employees* v. *Gago,* 717 F. 2d 1038 (CA7 1983); *Eichelberger* v. *Eichelberger,* 584 F. Supp. 899 (SD Tex. 1984). This judicial consensus, *amicus* argues, was codified by the QDRO provisions which were contained in the 1984 REA amendments. The *amicus* contends that since REA, or the pre-REA case law which it allegedly adopted, did not consider the community property rights of a nonparticipant spouse in the testamentary context, it should not be construed to pre-empt state law governing this different subject.

We disagree with this reasoning. It is true that the subject of testamentary transfers is somewhat removed from domestic relations law. The QDRO provisions address the rights of divorced and separated spouses, and their dependent children, which are the traditional concern of domestic relations law. The pre-REA federal common-law extension of § 1002(8)'s definition of "beneficiary" by courts in the con-

text of marital dissolution was in part based on an appreciation of the fact that domestic relations law is primarily an area of state concern, see *Marriage of Campa, supra,* at 124, 152 Cal. Rptr., at 367–368, and the basic principle that a beneficiary's interest in a spendthrift trust, despite otherwise applicable protections, can be reached in the context of divorce and separation. See E. Griswold, Spendthrift Trusts 389–391 (2d ed. 1947) (summarizing state case law); Restatement (Second) of Trusts § 157 (1959). The state court in *Marriage of Campa* took its implicit determination that the nonparticipant spouse was a beneficiary to its logical conclusion, forcing the pension plan to join the marital dissolution proceedings as a party and compelling it to pay the spouse her share of the pension benefits. Whether or not this extension of the definition of "beneficiary" was consistent with the statute then in force, these authorities are not applicable in light of the REA amendments. The QDRO and the surviving spouse annuity provisions define the scope of a nonparticipant spouse's community property interests in pension plans consistent with ERISA.

Respondents and their *amicus* in effect ask us to ignore § 1002(8)'s definition of "beneficiary" and, through case law, create a new class of persons for whom plan assets are to be held and administered. The statute is not amenable to this sweeping extratextual extension. It is unpersuasive to suggest that third parties could assert their claims without being counted as "beneficiaries." A plan fiduciary's responsibilities run only to participants and beneficiaries. § 1104(a)(1). Assets of a plan are held for the exclusive purposes of providing benefits to participants and beneficiaries and defraying reasonable expenses of administration. § 1103(c)(1). Reading ERISA to permit nonbeneficiary interests, even if not enforced against the plan, would result in troubling anomalies. Either pension plans would be run for the benefit of only a subset of those who have a stake in the plan or state law would have to move in to fill the appar-

ent gaps between plan administration responsibilities and ownership rights, resulting in a complex set of requirements varying from State to State. Neither result accords with the statutory scheme.

The conclusion that Congress intended to pre-empt respondents' nonbeneficiary, nonparticipant interests in the retirement plans is given specific and powerful reinforcement by the pension plan anti-alienation provision. Section 1056(d)(1) provides that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." Statutory anti-alienation provisions are potent mechanisms to prevent the dissipation of funds. In *Hisquierdo* we interpreted an anti-alienation provision to bar a divorced spouse's interest in her husband's retirement benefits. See 439 U. S., at 583–590. ERISA's pension plan anti-alienation provision is mandatory and contains only two explicit exceptions, see §§ 1056(d)(2), (d)(3)(A), which are not subject to judicial expansion. See *Guidry* v. *Sheet Metal Workers Nat. Pension Fund*, 493 U. S. 365, 376 (1990). The anti-alienation provision can "be seen to bespeak a pension law protective policy of special intensity: Retirement funds shall remain inviolate until retirement." J. Langbein & B. Wolk, Pension and Employee Benefit Law 547 (2d ed. 1995).

Dorothy's 1980 testamentary transfer, which is the source of respondents' claimed ownership interest, is a prohibited "assignment or alienation." An "assignment or alienation" has been defined by regulation, with certain exceptions not at issue here, as "[a]ny direct or indirect arrangement whereby a party acquires from a participant or beneficiary" an interest enforceable against a plan to "all or any part of a plan benefit payment which is, or may become, payable to the participant or beneficiary." 26 CFR § 1.401(a)–13(c)(1)(ii) (1997). Those requirements are met. Under Louisiana law community property interests are enforceable against a plan. See *Eskine* v. *Eskine*, 518 So. 2d 505, 508 (La. 1988). If respondents' claims were allowed to succeed

they would have acquired, as of 1980, an interest in Isaac's pension plan at the expense of plan participants and beneficiaries.

As was true with survivors' annuities, it would be inimical to ERISA's purposes to permit testamentary recipients to acquire a competing interest in undistributed pension benefits, which are intended to provide a stream of income to participants and their beneficiaries. See *Guidry, supra,* at 376 ("[The anti-alienation provision] reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners . . . and their dependents . . ."). Pension benefits support participants and beneficiaries in their retirement years, and ERISA's pension plan safeguards are designed to further this end. See § 1001(c). Besides the anti-alienation provision, Congress has enacted other protective measures to guarantee that retirement funds are there when a plan's participants and beneficiaries expect them. There are, for instance, minimum funding standards for pension plans and a pension plan termination insurance program which guarantees benefits in the event a plan is terminated before being fully funded. See §§ 1082, 1301–1461. Under respondents' approach, retirees could find their retirement benefits reduced by substantial sums because they have been diverted to testamentary recipients. Retirement benefits and the income stream provided for by ERISA-regulated plans would be disrupted in the name of protecting a nonparticipant spouses' successors over plan participants and beneficiaries. Respondents' logic would even permit a spouse to transfer an interest in a pension plan to creditors, a result incompatible with a spendthrift provision such as § 1056(d)(1).

Community property laws have, in the past, been preempted in order to ensure the implementation of a federal statutory scheme. See, *e. g., McCune* v. *Essig,* 199 U. S. 382 (1905); *Wissner* v. *Wissner,* 338 U. S. 655 (1950); *Free* v. *Bland,* 369 U. S. 663 (1962); *Hisquierdo* v. *Hisquierdo,* 439

U. S. 572 (1979); *McCarty* v. *McCarty*, 453 U. S. 210 (1981); *Mansell* v. *Mansell*, 490 U. S. 581 (1989); cf. *Ridgway* v. *Ridgway*, 454 U. S. 46 (1981). *Free* v. *Bland*, *supra*, is of particular relevance here. A husband had purchased United States savings bonds with community funds in the name of both spouses. Under Treasury regulations then in effect, when a co-owner of the bonds died, the surviving co-owner received the entire interest in the bonds. After the wife died, her son—the principal beneficiary of her will—demanded either one-half of the bonds or reimbursement for loss of the community property interest. The Court held that the regulations pre-empted the community property claim, explaining:

> "One of the inducements selected by the Treasury is the survivorship provision, a convenient method of avoiding complicated probate proceedings. Notwithstanding this provision, the State awarded full title to the co-owner but required him to account for half of the value of the bonds to the decedent's estate. Viewed realistically, the State has rendered the award of title meaningless." *Id.*, at 669.

The same reasoning applies here. If state law is not pre-empted, the diversion of retirement benefits will occur regardless of whether the interest in the pension plan is enforced against the plan or the recipient of the pension benefit. The obligation to provide an accounting, moreover, as with the probate proceedings referred to in *Free*, is itself a burden of significant proportions. Under respondents' view, a pension plan participant could be forced to make an accounting of a deceased spouse's community property interest years after the date of death. If the couple had lived in several States, the accounting could entail complex, expensive, and time-consuming litigation. Congress could not have intended that pension benefits from pension plans would be given to accountants and attorneys for this purpose.

Respondents contend it is anomalous and unfair that a divorced spouse, as a result of a QDRO, will have more control over a portion of his or her spouse's pension benefits than a predeceasing spouse. Congress thought otherwise. The QDRO provisions, as well as the surviving spouse annuity provisions, reinforce the conclusion that ERISA is concerned with providing for the living. The QDRO provisions protect those persons who, often as a result of divorce, might not receive the benefits they otherwise would have had available during their retirement as a means of income. In the case of a predeceased spouse, this concern is not implicated. The fairness of the distinction might be debated, but Congress has decided to favor the living over the dead and we must respect its policy.

The axis around which ERISA's protections revolve is the concepts of participant and beneficiary. When Congress has chosen to depart from this framework, it has done so in a careful and limited manner. Respondents' claims, if allowed to succeed, would depart from this framework, upsetting the deliberate balance central to ERISA. It does not matter that respondents have sought to enforce their rights only after the retirement benefits have been distributed since their asserted rights are based on the theory that they had an interest in the undistributed pension plan benefits. Their state-law claims are pre-empted. The judgment of the Fifth Circuit is

*Reversed.*

JUSTICE BREYER, with whom JUSTICE O'CONNOR joins, and with whom THE CHIEF JUSTICE and JUSTICE GINSBURG join except as to Part II–B–3, dissenting.

The question in this case is whether the Employee Retirement Income Security Act of 1974 (ERISA), 29 U. S. C. § 1001 *et seq.*, "pre-empts," and thereby nullifies, state community property law. The state law in question would permit a wife to leave to her children her share of the pension

assets that her husband has earned (or, to put the matter in "community property" terms, that she and her husband together have earned) during their marriage. From the perspective of property law, the issue is unusually important, for, we are told, the answer potentially affects nine community property States, with more than 80 million residents, and over $1 trillion in ERISA-qualified pension plans—plans that are often a couple's most important lifetime assets. In my view, Congress did not intend ERISA to pre-empt this testamentary aspect of community property law—at least not in the circumstances present here, where a first wife's bequest need not prevent a second wife from obtaining precisely those benefits that ERISA specifically sets aside for her. See § 1055(a). The Fifth Circuit's determination is consistent with this view. I would therefore affirm its judgment.

## I

## A

This case concerns the disposition of pension plan assets earned by an employee who was married; who had children; whose first wife died; who remarried; who retired; and who then died, survived by his second wife. To be more specific, the employee, Isaac Boggs, a resident of Louisiana, began work for South Central Bell Telephone Company (now known as BellSouth) in 1949. He participated in its ERISA-qualified pension plan for about 36 years. He was married to his first wife, Dorothy Boggs, during almost all of that time—from 1949 until 1979, when Dorothy died. The couple had three children. Isaac married his second wife, Sandra, in 1980. He retired in 1985. He died in 1989. Sandra survives him.

When Dorothy died, she left a will providing that Isaac would receive " 'the maximum [share of her estate] permitted under the law,' " as well as a lifetime " 'usufruct' " (rather like a common-law life estate) in the remainder. Brief for

Respondents 1, 2. The parties agree that this meant that Isaac received one-third of her estate outright. Under Louisiana law, the three sons of Dorothy and Isaac would receive what was left of the remaining two-thirds at Isaac's death (*i. e.*, the "naked ownership," or the equivalent of a common-law remainder).

Throughout his working life, and during his entire 30-year marriage to Dorothy, Isaac participated in a set of BellSouth's ERISA-qualified retirement plans. When Isaac retired in 1985 (six years after Dorothy's death), he received three assets from those plans: (1) *96 shares of AT&T stock* (from BellSouth's Employee Stock Ownership Plan); (2) *a cash payment of about $150,000* (from BellSouth's Savings Plan for Salaried Employees); and (3) *an annuity of about $1,800 per month* (from BellSouth's Management Pension Plan) for his life and afterwards for that of his surviving second spouse, Sandra. Isaac almost immediately placed the $150,000 cash payment in an Individual Retirement Account (IRA), thereby avoiding immediate payment of an income tax. See 26 U. S. C. § 408(e)(1); see also S. Bruce, Pension Claims: Rights and Obligations 7 (2d ed. 1993). Isaac bequeathed a lifetime usufruct in his property, presumably including some or all of the AT&T stock and the funds in the IRA, to his second wife, Sandra. Sandra, as his survivor, also began to receive the $1,800 monthly annuity.

## B

On December 17, 1992, Sandra Boggs filed an action for declaratory judgment in Federal District Court. See 29 U. S. C. § 1132(a)(1)(B) (plan participant or beneficiary may bring action to "clarify . . . rights to future benefits"). She said that the three children of Isaac and Dorothy had themselves brought an action in state court against her and against Isaac's estate, seeking a portion of the pension benefits from the BellSouth plans. The children said that under Louisiana law, their mother, Dorothy, had owned a one-half

share in Isaac's rights under the BellSouth retirement plans (insofar as they had accrued prior to Dorothy's death) and that she had left them a portion of that share (two-thirds of the "naked interest" after Isaac's death). They asked (in Sandra's words) for "an accounting" as well as "for an undivided interest in, and/or the value of an undivided interest in, the assets and/or benefits" that were paid out of the pension plans. Petition for Declaratory Judgment in No. 92–4174 (ED La., Nov. 16, 1992), p. 3. Sandra asked the District Court to declare that, insofar as state law entitled the children to some of the plan benefits, ERISA pre-empted that state law. In a nutshell, she asked the court to say that the shares of stock, the cash, and the annuity payments were entirely hers.

The District Court disagreed with Sandra. It denied her motion for summary judgment and declared that "ERISA does not preempt Louisiana's community property laws." 849 F. Supp. 462, 467 (ED La. 1994); see also Judgment in No. 92–4174 (ED La., Mar. 9, 1994), p. 1. The Fifth Circuit Court of Appeals affirmed. We are reviewing the Fifth Circuit's decision in respect to pre-emption; and we must therefore assume its view of the relevant facts and state law.

## II

Judge Wisdom, writing for the Fifth Circuit in this case, described Louisiana's community property law as a "system" that "conceives of marriage as a partnership in which each partner is entitled to an equal share." 82 F. 3d 90, 96 (1996); see also W. McClanahan, Community Property in the United States § 2:27, p. 38 (1982) (hereinafter McClanahan) (community property law views marriage "as a civil contract between two persons who ente[r] into the relationship as equals and retai[n] their individual personalities"). Recognizing "the value a spouse, though non-employed, contributes to a marriage," 82 F. 3d, at 96, the state law provides that the interest in pension benefits that accrued during Isaac's mar-

riage to Dorothy belongs *both* to Isaac and to Dorothy—that is, to them as a community—and not to the one any more than to the other. La. Civ. Code Ann., Art. 2338 (West 1985) (community property includes "property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse"); *T. L. James & Co.* v. *Montgomery,* 332 So. 2d 834, 841–844, 846 (La. 1975) (pension benefits are community property even if the employee spouse makes no cash contributions to plan).

Louisiana law, like the law of other States, today allows both women and men to leave their property to their children. La. Civ. Code Ann., Art. 2346 (West 1985) ("Each spouse acting alone may manage, control, or dispose of community property unless otherwise provided by law"). Cf. 16 K. Spaht & W. Hargrave, Louisiana Civil Law Treatise, Matrimonial Regimes 1–2 (1989) (until 1980, Louisiana law considered a husband to be the " 'head and master' " and exclusive manager of community property). And we must assume, as did the Fifth Circuit, that Louisiana law would permit Dorothy's children, to whom she left her property, to obtain an accounting to determine the extent to which the stock, the IRA, and the monthly annuity, in fact belong to them. See 82 F. 3d, at 97 ("[Dorothy's] spouse, or his estate, owes her an obligation to account for her share of the pension"); see also La. Civ. Code Ann., Art. 3261 (West 1961) (succession representative has broad power, subject to probate court approval, to liquidate an estate through sale or exchange of estate assets "to pay debts and legacies, or for any other purpose"). Cf. La. Rev. Stat. Ann. § 9:2801 (West 1991 and Supp. 1997) (judicial partition of assets on divorce); *Hare* v. *Hodgins,* 586 So. 2d 118, 123 (La. 1991) (to equalize allocation of community assets on termination, court may grant "cash or other property in lieu of an actual percentage of the pension payments"); *T. L. James, supra,* at 851, n. 2 (opinion on rehearing) (same); *Sims* v. *Sims,* 358 So. 2d 919, 924 (La. 1978) (formula for calculating a former spouse's

share of pension benefits); McClanahan § 12:15, pp. 547–550 (state courts may allocate entire pension to employee spouse and allocate to other spouse other community property equal in value to half of pension); cf. also *Succession of McVay*, 476 So. 2d 1070, 1073–1074 (La. App. 1985) (decedent's IRA, which contained community property assets, could not be listed as an asset of his estate because he had designated a beneficiary; however, his estate would be deemed to contain the equivalent cash value). See generally La. Civ. Code Ann., Art. 4 (West 1993) ("When no rule for a particular situation can be derived from legislation or custom, the court is bound to proceed according to equity").

We ask here whether—or the extent to which—ERISA stands as an obstacle to the enforcement of this state law as applied in this case. It does so if state law "relate[s] to any employee benefit plan," 29 U. S. C. § 1144(a), or if it conflicts with specific provisions of ERISA. Applying the relevant criteria, I can find no basis for pre-emption.

## A

Louisiana community property law "relates to" an ERISA plan within the meaning of § 1144(a) if it expressly "refer[s]" to such a plan, or if it has an impermissible "connection with" a plan. *California Div. of Labor Standards Enforcement v. Dillingham Constr., N. A., Inc.*, 519 U. S. 316, 324 (1997). Neither of these grounds for pre-emption is present here.

The relevant Louisiana statute does not refer to ERISA or to pensions at all. It simply says that "property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse" is "community property." La. Civ. Code Ann., Art. 2338 (West 1985). Nor does the statute act exclusively on, or rely on the existence of, ERISA plans. See *Dillingham, supra*, at 324–325. The statute's application to this case arises out of judicial interpretation, see *T. L. James, supra*, at 841; McClanahan § 6:21, p. 365, of a sort that is likely to be present whenever a generally

phrased state statute affects an ERISA plan, among other things. Hence there is no specific "reference" problem.

The "connection" problem is more difficult. Insofar as that term refers to a conflict with an ERISA purpose, I discuss the matter primarily in Part II–B, *infra*. The term "connection," however, might also encompass the question whether state law intrudes into an area Congress (given ERISA's basic objectives) would have wanted to reserve exclusively for federal legislation. *Dillingham, supra*, at 324 (quoting *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 655 (1995)). Cf. *Malone* v. *White Motor Corp.*, 435 U. S. 497, 504 (1978) (state law is pre-empted when it falls within a field that Congress has sought to occupy); *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 244–245 (1959) (States may not regulate activities that are protected or prohibited under National Labor Relations Act); *Garner* v. *Teamsters*, 346 U. S. 485, 498–499 (1953) (States may not add to or subtract from remedies provided in National Labor Relations Act). In my view, this latter problem (sometimes called "field pre-emption," see *Dillingham, supra*, at 336 (SCALIA, J., concurring)) is not present here.

The state law in question concerns the ownership of benefits. I concede that a primary concern of ERISA is the proper financial management of pension and welfare benefit funds themselves, *Dillingham, supra*, at 326–327 (citing *Massachusetts* v. *Morash*, 490 U. S. 107, 115 (1989)), and that payment of benefits (which amounts to the writing of checks from those funds) is closely "connected with" that management. I also concede that state laws that affect those payments lie closer to ERISA's federal heart than do state laws that, say, affect those goods and services that ERISA benefit plans purchase, such as apprenticeship training programs, 519 U. S., at 332–334, or medical benefits, *De Buono* v. *NYSA–ILA Medical and Clinical Services Fund, ante*, at 814–816. But, even so, I cannot say that the state law at

issue here concerns a subject that Congress wished to place outside the State's legal reach.

My reason in part lies in the fact that the state law in question involves family, property, and probate—all areas of traditional, and important, state concern. *Rose* v. *Rose*, 481 U. S. 619, 625 (1987) (domestic relations law traditionally left to state regulation); *Hisquierdo* v. *Hisquierdo*, 439 U. S. 572, 581 (1979) (same); *Zschernig* v. *Miller*, 389 U. S. 429, 440 (1968) ("The several States, of course, have traditionally regulated the descent and distribution of estates"). But see *ante*, at 848 (majority's effort to distinguish property interests passing at divorce from those passing by devise). When this Court considers pre-emption, it works "on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Dillingham, supra*, at 325 (quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218 (1947)).

I can find no reasonably defined relevant category of state law that Congress would have intended to displace. Obviously, Congress did not intend to pre-empt all state laws that govern property ownership. After all, someone must own an interest in ERISA plan benefits. Nor, for similar reasons, can one believe that Congress intended to pre-empt state laws concerning testamentary bequests. This is not an area like, say, labor relations, where Congress intended to leave private parties to work out certain matters on their own. See *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S. 132, 144–148 (1976). The question, "who owns the property?" needs an answer. Ordinarily, where federal law does not provide a specific answer, state law will have to do so.

Nor can I find some appropriately defined forbidden category by looking to the congressional purpose of establishing uniform laws to regulate the administration of pension funds. Cf. *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133 (1990);

*Massachusetts* v. *Morash, supra,* at 115. This case *does not involve a lawsuit against a fund.* I agree with the majority that ERISA would likely pre-empt state law that permitted such a suit. But this is not such a case; nor is there reason to believe Louisiana law would produce such a case. (*Eskine* v. *Eskine,* 518 So. 2d 505 (La. 1988), which is cited by the majority, involved a governmental plan that was not covered by ERISA. See *id.,* at 506; 29 U. S. C. §§ 1002(32), 1003(b)(1).)

The lawsuit before us concerns benefits that the fund has already distributed; it asks not the fund, but others, for a subsequent accounting. And, as I discuss in Part II–B–3 below, this lawsuit will not interfere with the payment of a survivor annuity to Sandra. See § 1055(a). Under these circumstances, I do not see how allowing the respondents' suit to go forward could interfere with the administration of the BellSouth pension plan according to ERISA's requirements. Whether or not the children are allowed to seek an accounting, the plan fiduciaries will continue to owe a duty only to plan participants and beneficiaries. See §§ 1103(c)(1), 1104(a)(1). Contrary to the majority's suggestion, Dorothy's children are not the equivalent of plan "participants" or "beneficiaries," see §§ 1002(7), 1002(8), any more than would be a grocery store, a bank, an IRA, or any other recipient of funds that have emerged from a pension plan in the form of a distributed benefit, and no one here claims the contrary. Moreover, the children here are seeking an accounting only after the plan participant has died. But even were that not so, any threat the children's lawsuit could pose to plan administration is far less than that posed by the division of plan assets upon separation or divorce, which is allowed under § 1056(d). See Part II–B–2, *infra.*

Of course, one could look for a still more narrowly defined category, such as the category of "testamentary bequests of ERISA pension benefits by one spouse who dies before the other." But to narrow the category to this extent is to

change the question from one about occupying the field, to one about whether, or the extent to which, Louisiana law frustrates or interferes with an important federal purpose.

That question is important. Indeed, the Court, in other cases, has found conflicts between state community property law and federal statutes governing retirement, insurance, and savings funds *operated and/or funded by the Federal Government*. See *Mansell* v. *Mansell*, 490 U. S. 581, 587–595 (1989); *McCarty* v. *McCarty*, 453 U. S. 210, 221–236 (1981); *Ridgway* v. *Ridgway*, 454 U. S. 46, 53–61 (1981); *Hisquierdo, supra*, at 582–590; *Free* v. *Bland*, 369 U. S. 663 (1962); *Wissner* v. *Wissner*, 338 U. S. 655, 658–660 (1950). But those cases turned on the particular federal purposes embodied in the particular federal statutes at issue. The question posed here similarly requires an examination of ERISA's specific statutory provisions to see whether they reveal language or an important purpose with which the State's community property laws conflict—either directly, or in the sense that the state laws "frustrate" the achievement of a statutory purpose. See *Malone*, 435 U. S., at 504. I now turn to that question.

B

Sandra Boggs, supported by the Acting Solicitor General, points to three statutory provisions with which, she believes, Louisiana law conflicts—an anti-alienation provision, 29 U. S. C. § 1056(d)(1), a provision dealing with an exception to the anti-alienation section for "qualified domestic relations order[s]," § 1056(d)(3)(A), and a provision that concerns joint and survivor pension annuities, § 1055. I shall consider each in turn.

1

ERISA's "anti-alienation" provision, § 1056(d)(1), says that "benefits provided under the [qualified ERISA plan] may not be assigned or alienated." We have stated that this provision reflects "a decision to safeguard a stream of income for

pensioners (and their dependents . . .)." *Guidry* v. *Sheet Metal Workers Nat. Pension Fund,* 493 U. S. 365, 376 (1990). Sandra Boggs and the Acting Solicitor General claim that Louisiana law interferes with a significant "anti-alienation" objective, both (1) by permitting Dorothy, the nonparticipant spouse, to obtain an undivided interest in the pension of Isaac, the participant spouse; and (2) by permitting Dorothy to transfer that interest on her death to her children, who, as far as ERISA is concerned, are third parties.

The first claim—simply attacking Dorothy's possession of an undivided one-half interest in that portion of retirement benefits that accrued during her marriage to Isaac—does not attack any "assign[ment]" of an interest nor any "aliena[tion]" of an interest, for Dorothy's interest arose not through assignment or alienation, but through the operation of Louisiana's community property law itself. Thus, Sandra's claim must be that community property law's grant of an undivided one-half interest in retirement benefits to a nonparticipant wife or husband itself violates some congressional purpose. But what purpose could that be? Congress has recognized that community property law, like any other kind of property law, can create various property interests for nonparticipant spouses. See 29 U. S. C. § 1056(d)(3)(B) (ii)(II). Community property law, like other property law, can provide an appropriate legal framework for resolving disputes about who owns what. § 1056(d)(3). The anti-alienation provision is designed to prevent plan beneficiaries from prematurely divesting themselves of the funds they will need for retirement, not to prevent application of the property laws that define the legal interest in those funds. One cannot find frustration of an "anti-alienation" purpose simply in the state law's definition of property.

The second claim—attacking Dorothy's testamentary transfer to her children—is more plausible. Nonetheless, with one exception discussed below, ERISA does not concern itself with what a pension fund beneficiary, such as Isaac,

does with his pension money at his death. That is not surprising, for after the death of a beneficiary the money is no longer needed for that beneficiary's support. And if ERISA does not embody a congressional purpose to restrict what Isaac can do with his pension funds after his death, there is no reason to believe it embodies some similar general purpose with respect to Dorothy. Insofar as the pension is community property, it belongs to both Dorothy and Isaac equally; it is just as much hers as his. Why, then, should ERISA restrict her testamentary power in respect to her property any more than it restricts his?

I see one possible answer to this question. One might argue that, because Dorothy was the *first* to die, her testamentary transfer gave to third parties (persons to whom ERISA is indifferent) funds that Isaac might otherwise have used during his retirement; and, for that reason, the testamentary transfer tends to frustrate the purpose of the "anti-alienation" provision or some more general ERISA purpose. This argument (with one exception, see Part II–B–3, *infra*) is beside the point, however, for the state-law action here seeks an accounting that will take place after the deaths of *both* Dorothy and Isaac. Moreover, the argument depends upon doubtful assumptions about Congress' purposes. Consider the 96 shares of stock and $150,000 cash that Isaac received from the plans when he retired. Dorothy's bequest affects those assets—the stock and the cash—not while they remain in BellSouth's pension plan funds, but only after they have emerged from the plan in the form of a distributed payment. As far as ERISA is concerned, Isaac could have used the retirement benefits to pay for a vacation, to buy a house, or to bet at the races, or he could have given the money to his children. ERISA would have left Dorothy similarly free to do what she wished with her share of the stock and the cash, had she been alive at the time of their receipt. That being so, I do not understand why or how ERISA could be concerned about Dorothy's creation of a will, which affected

the retirement assets only after Isaac received them. I recognize that Isaac did not use the $150,000 to buy a new house, or to pay for medical expenses, or to gamble; rather, he put the money into an IRA. But no one has explained why that fact—which in all likelihood reflects the exigencies of tax law, see 26 U. S. C. § 408(e)(1)—should make any difference here.

2

Sandra Boggs and the Acting Solicitor General look for support to another portion of the anti-alienation section—an amendment that was part of the Retirement Equity Act of 1984 (REA), Pub. L. 98–397, 98 Stat. 1426—that affects the division of assets upon divorce. That section says that the "anti-alienation" provision, 29 U. S. C. § 1056(d)(1), "shall not apply if the order is determined to be a qualified domestic relations order" (QDRO). § 1056(d)(3)(A). The provision defines QDRO's to include certain court orders that are "made pursuant to a State domestic relations law (including a community property law)," § 1056(d)(3)(B)(ii)(II), and meet certain other requirements, §§ 1056(d)(3)(B)(i), 1056(d)(3)(C), 1056(d)(3)(D). The Government argues that this provision shows that court orders count as "alienations" prohibited under § 1056(d)(1), and that since the probate court orders effectuating Dorothy's testamentary transfers do not fall within the QDRO exception, the "anti-alienation" section, as amended and taken as a whole, pre-empts Louisiana law.

The QDRO provisions, in my view, do not support the Government's argument. The QDRO exception does not purport to interpret the "anti-alienation" provision (quoted *supra,* at 863). Rather, it simply says that the provision

"shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order . . . ." § 1056(d)(3)(A).

The section defines "domestic relations order" (not *quali-fied* domestic relations order") as a court order, judgment, or decree made pursuant to state domestic relations law, which

> "relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant." § 1056(d)(3)(B)(ii)(I).

It then exempts "qualified" orders from the scope of the anti-alienation provision. § 1056(d)(3)(A). This language does not tell us what the word "alienation" would cover in its absence. It does not tell us whether the amendment taken as a whole *clarified* that the anti-alienation provision covers court orders (which would help Sandra) or *extended* that coverage so that it included domestic relations orders (which would help the children). Hence, the amendment tells us virtually nothing relevant about whether the prohibition on anti-alienation applies to matters not covered by the term "domestic relations orders," such as probate court orders.

Second, the amendment, taken as a whole, concerns divorce and separation, not probate. See Department of Labor Advisory Opinion 90–46A, issued Dec. 4, 1990 (citing 130 Cong. Rec. 13327 (1984); S. Rep. No. 98–575, pp. 18–19 (1984)) (in enacting REA, Congress focused on marital dissolution and dependent support). The amendment says that state-court judges cannot award pension-related property to a nonparticipant spouse *unless* the order doing so meets certain requirements, such as recordkeeping requirements and a prohibition against increasing the amount of benefits that an ERISA plan would otherwise have to pay. §§ 1056(d)(3)(C), 1056(d)(3)(D). As I have said, Congress did this by stating that the anti-alienation section covers divorce-related court orders, and then exempting "qualified" orders from the additional coverage just created. The amendment thus regulates transfers between living spouses;

it does not intend to affect testamentary transfers taking place after death.

Third, the QDRO provision shows that Congress did not object to court orders that transfer pension benefits from an ERISA plan participant to a former spouse who is alive—at least if those court orders meet certain procedural requirements. Why then, one might ask, would Congress object to court orders that transfer benefits to a former spouse after her death? Had Dorothy Boggs remained with Isaac for many years and then divorced him, she could have obtained a QDRO that would have declared her community property interest in Isaac's pension benefits, and she could then have left that interest to her children. That being so, it would be anomalous to find a congressional purpose in ERISA—despite the absence of express statutory language and any indication that Congress even considered the question—that would in effect deprive Dorothy of her interest because, instead of divorcing Isaac, she "stay[ed] with him till her last breath." Tr. of Oral Arg. 15.

Finally, the language of § 1056(d), even if taken literally, does not help Sandra significantly, for a probate court order awarding property to an estate or to children cannot easily be squeezed into the definition of "domestic relations order." An order placing property in the estate is not an order that provides property rights to a "spouse, former spouse, child, or dependent," and an order distributing an estate's property to a child is not readily described as an order relating to "marital property rights." See Department of Labor Advisory Opinion, *supra* (probate orders are not "domestic relations orders").

3

Sandra Boggs and the Acting Solicitor General rely on a third statutory provision, § 1055, which sets forth specific provisions concerning the payment of annuities to a plan participant's surviving spouse. Section 1055(a) says that an ERISA plan must ensure that "the accrued benefit" that is

"payable" to the plan "participant" takes "the form of a qualified joint and survivor annuity," § 1055(a)(1). The term "qualified joint and survivor annuity" means an "annuity" to a plan participant for his life, with a surviving spouse, such as Sandra, that is "not less than 50 percent of (and is not greater than 100 percent of) the amount of the annuity which is payable during the joint lives of the participant and the spouse." § 1055(d).

The parties have not argued that this provision affects the shares of stock or the $150,000 lump sum. I need not decide whether that is so. That is because, if these assets do count as "accrued benefits" under § 1055(d), the plan would then have had to insist on a waiver from Sandra in order to pay them out in the way that it did—i. e., in a form other than an annuity. Thus, I assume either that the stock and cash were not "accrued benefits" under § 1055(d), or that Sandra waived her rights under § 1055. Either way, § 1055 would not affect the outcome as to the stock and the cash.

The $1,800 monthly annuity payments, however, are a different matter. They were paid from the BellSouth Management Pension Plan, a "defined benefit" pension plan, initially to Isaac during his lifetime, and then to his second wife, Sandra, for her life. These annuities do fall within the scope of § 1055. This ERISA provision seeks to guarantee that the person who was a participant's spouse at the time of the participant's death will receive an annuity as described (unless the spouse has waived the right to receive the survivor annuity, §§ 1055(c) (waiver of survivor portion of annuity), 1055(g) (election of cash distribution rather than annuity)). See S. Rep. No. 98–575, at 12; 26 CFR § 1.401(a)–11 (1996). I agree with the majority that Louisiana cannot give Dorothy's children a share of the pension annuity that Sandra is receiving without frustrating the purpose of this provision.

This inconsistency does not end the matter, however, for Dorothy's children here sought different relief. Although the children apparently requested a portion of Sandra's

monthly annuity payments in their state-court pleading, Record 134, they stipulated at oral argument that they are seeking only an accounting, Tr. of Oral Arg. 33–34. And according to Sandra's complaint for declaratory judgment, the children have asked for an "accounting"; the Fifth Circuit, too, spoke only of an "accounting," and did not mention relief in the form of a percentage of Sandra's annuity. See 82 F. 3d, at 94, 97, 98.

The difference is important, for, as the children pointed out at oral argument, an accounting would simply declare that, when Dorothy died, she had a community property interest in Isaac's pension benefits. And it is possible that Louisiana law would permit Dorothy (or her heirs) to collect not the pension benefits themselves, but other nonpension community assets of equivalent value. See La. Civ. Code Ann., Art. 3261 (West 1961) (succession representative has broad power, subject to probate court approval, to liquidate an estate through sale or exchange of estate assets "to pay debts and legacies, or for any other purpose"). Cf. La. Rev. Stat. Ann. § 9:2801 (West 1991 and Supp. 1997) (judicial partition of assets on divorce); *Hare* v. *Hodgins*, 586 So. 2d, at 123 (to equalize allocation of community assets on termination, court may grant "cash or other property in lieu of an actual percentage of the pension payments"); *T. L. James*, 332 So. 2d, at 851, n. 2 (opinion on rehearing) (same); *Sims* v. *Sims*, 358 So. 2d, at 924 (setting forth formula for calculating a former spouse's share of pension benefits); McClanahan § 12:15, pp. 547–550 (state courts may allocate entire pension to employee spouse and allocate to other spouse other community property equal in value to half of pension).

In this case, Isaac apparently retained possession of other, nonpension assets from the Dorothy-Isaac community after Dorothy's death because her will gave him a lifetime usufruct in the portion of her estate that she did not bequeath to him outright. (And if Dorothy had not bequeathed that portion of her estate to anyone, it appears that Louisiana law

would automatically have given him a usufruct until his death or remarriage. See La. Civ. Code Ann., Art. 890 (West Supp. 1997).) In such a circumstance, Louisiana law might provide an accounting to allow Dorothy's estate, or her heirs, to recover Dorothy's community property share of those nonpension assets from Isaac's estate, or from his heirs, after his death. In applying such a law, a Louisiana court might allocate property so that federally granted property rights, such as Sandra's right to a survivor annuity, are fully protected. Cf. *Bendler* v. *Marshall*, 513 So. 2d 369 (La. App. 1987) (first wife is entitled to reimbursement of her community property share of husband's pension contributions, but not from second, surviving wife; first wife is not entitled to share of second wife's survivor annuity); *Succession of McVay*, 476 So. 2d, at 1073–1074 (decedent's IRA, which contained community property assets, could not be listed as an asset of his estate because he had designated a beneficiary; however, his estate would be deemed to contain the equivalent cash value). See generally La. Civ. Code Ann., Art. 4 (West 1993) ("When no rule for a particular situation can be derived from legislation or custom, the court is bound to proceed according to equity").

Of course, the lower courts did not describe the precise nature of Dorothy's state-law interest, nor did they explain exactly how the accounting worked. They did no more than deny Sandra's request for a declaratory judgment that ERISA prohibits an accounting. But that may reflect the fact that no one raised a § 1055 argument until after the Court of Appeals panel's decision in this case. We therefore should not grant Sandra her declaratory judgment unless we are certain Louisiana law could not lawfully permit Dorothy to leave her community property interest in the pension assets to her children. And, given the authority just cited, state law *might* lawfully do so, very roughly in the way the following imaginary example illustrates:

Assume at the time of Dorothy's death Dorothy and Isaac owned the following community property:

| | |
|---|---|
| Pension assets | $ 60,000 |
| Stock investments | 140,000 |
| Total | $200,000 |

Louisiana law might then provide that Dorothy and Isaac each owned $100,000 worth of community assets. Louisiana law might also provide (or permit a probate court to decide) that the share belonging to Dorothy's estate consisted of $100,000 worth of stock, leaving Isaac with $40,000 in stock and $60,000 in pension assets. If that is so, why should ERISA care? And if Louisiana law should simply *postpone* the division of the Dorothy-Isaac community's property until after Isaac's death because of his lifetime usufruct, why should ERISA care any more? Moreover, if Isaac bequeathed the entire $140,000 worth of stock to a charity, I assume that the probate court would block most of the bequest on the ground that $100,000 worth of stock was not Isaac's to give away. I assume it would do the same if he tried to give Sandra the entire $140,000. And I do not see why ERISA would care about the stock (which, after all, belonged to Dorothy) in either case.

I cannot understand why Congress would want to preempt Louisiana law if (or insofar as) that law provides for an accounting and collection from other property—*i. e.*, property other than the annuity that § 1055 requires the Bell-South plans to pay to Sandra. The survivor annuity provision assures Sandra that she will receive an annuity for the rest of her life. Louisiana law (on my assumption) would not take from her either that annuity or any other asset that belongs to her. The most one could say is that Sandra will not receive certain other assets—assets that belonged to the Dorothy-Isaac community and that Isaac had no right to give to anyone in the first place.

Nothing in ERISA suggests that it cares about what happens to those other assets. The survivor annuity provision says nothing about them. Indeed, Isaac, or the Dorothy-Isaac community, might, or might not, have had other assets. Isaac might, or might not, have tried to leave all, or some, of those other assets to Sandra, or to his children, or to charity. ERISA seems to be indifferent to the presence, or absence, of *other assets* and to what Isaac did or did not try to do with them. After all, if Dorothy had divorced Isaac, ERISA would have permitted state law to give her not only other assets, but also half of the pension itself (which would have left a later-appearing Sandra with a diminished annuity). See § 1056(d)(3)(A). Given Congress' purpose of allowing state courts to give first wives their community property share of pension assets, why would Congress have intended to include a silent implication that strips Dorothy of an asset that may be the bulk of her community property—simply because, instead of divorcing Isaac, she remained his wife until she died?

On the assumptions I have made, to find a conflict in this case, one would have to depart from what Congress actually said in ERISA and infer some more abstract general purpose, say to help a second wife at the expense of a first wife's state-law-created interest in other property. But should we take anything like this latter approach, there would be no logical stopping place. Confusion and unnecessary interference with state property laws would become inevitable. Moreover, we should be particularly careful in making assumptions about the interaction of § 1055 and Louisiana law, as the courts below did not consider § 1055 as a possible ground for conflict pre-emption.

In sum, an annuity goes to Sandra, a surviving spouse; but otherwise Dorothy would remain free not only to have, but to bequeath, her share of the marital estate to her children. This reading of the relevant statutory provisions and purposes protects Sandra, limits ERISA's interference with

basic state property and family law, and minimizes the extent to which ERISA would interfere with Dorothy's preexisting property. Cf. *Hodel* v. *Irving*, 481 U. S. 704, 717 (1987) (federal statute stripping property owner of right to pass interest by descent or devise constitutes taking under Fifth Amendment); *Babbitt* v. *Youpee*, 519 U. S. 234, 244–245 (1997) (statutory restriction on class of permissible heirs constitutes taking).

These general reasons, as well as the specific reasons provided above, convince me that ERISA does not pre-empt the Louisiana law in question. And I would therefore affirm the judgment below.