# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-2221/2226/2229

_____

THE PRUDENTIAL INSURANCE    *
COMPANY OF AMERICA,    *
PRUDENTIAL HEALTH CARE    *
PLAN, INC., d/b/a PRUDENTIAL    *
HEALTH CARE PLAN OF    *
ARKANSAS, HMO PARTNERS, INC., *
ARKANSAS AFL-CIO, TYSON    *
FOODS, INC., and UNITED PAPER-   *
WORKERS INTERNATIONAL    *
UNION AFL-CIO, CLC,    *
   *
    Plaintiffs-Appellees,    *    Appeals from the United States
    Cross-Appellants,    *    District Court for the Eastern
   *    District of Arkansas
v.    *
   *
NATIONAL PARK MEDICAL    *
CENTER, INC., Y. Y. KING, M.D.,   *
BRYAN W. RUSSELL, D.C.,    *
GEORGE A. HAAS, O.D., and    *
BRYANT ASHLEY, O.D.,    *
   *
    Defendants-Appellants.    *
   *
STATE OF ARKANSAS,    *
   *
    Intervenor Defendant -    *
    Appellee.    *

_____

Submitted:  March 10, 1998

Filed: September 2, 1998
_____


Before MCMILLIAN and FAGG, Circuit Judges, and BENNETT,[*] District Judge.
_____


BENNETT, District Judge.


This case involves the question of whether the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq*., preempts Arkansas' so-called "Patient Protection Act," Acts 505 and 1193 passed by the Arkansas General Assembly in 1995 (the Arkansas PPA).  The Arkansas General Assembly's goal in passing the PPA was to ensure "that patients . . . be given the opportunity to see the health care provider of their choice."  ARK. CODE ANN. § 23-99-202.  However, various "health care insurers" within the meaning of the Arkansas PPA brought this declaratory judgment action seeking a declaration that the Arkansas PPA is preempted by ERISA.

The precise scope of ERISA preemption of state law has left courts, including the Supreme Court, deeply troubled.  As a panel of this court recently explained,

> The Supreme Court has decided sixteen ERISA preemption cases since the statute was enacted in 1974.  *See California Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A., Inc.*, [519] U.S. [316], ___, 117 S. Ct. 832,

_____

[*]The HONORABLE MARK W. BENNETT, United States District Judge for the Northern District of Iowa, sitting by designation.

2

842-43, 136 L. Ed. 2d 791 (1997) (Scalia, J., concurring). Most involved the proper scope of "relate to" preemption under § 1144(a), and the Court has struggled, particularly in its more recent decisions, with the inherent vagueness of that key statutory phrase. *Compare New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 652-661, 115 S. Ct. 1671, 1676-80, 131 L. Ed. 2d 695 (1995), *with Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739, 105 S. Ct. 2380, 2388, 85 L. Ed. 2d 728 (1985).

*Painter v. Golden Rule Ins. Co.*, 121 F.3d 436, 438-39 (8th Cir. 1997), *cert. denied*, ___ U.S. ___, ___ S. Ct. ___, 1998 WL 73018 (April 20, 1998). Since the Supreme Court's decision in *Dillingham*, the Court has considered the scope of ERISA preemption twice more. *See Boggs v. Boggs*, ___ U.S. ___, 117 S. Ct. 1754 (1997); *De Buono v. NYSLA-ILA Med. & Clinical Servs. Fund*, ___ U.S. ___, 117 S. Ct. 1747 (1997). The very question that has so often and so deeply troubled the Supreme Court is now before this court.

The parties asserting the validity of the Arkansas PPA, appellant healthcare providers, contend that the result of the Supreme Court's struggles with "relate to" preemption in its recent ERISA cases has been a "sea change"—ushered in by the Court's decision in *Travelers* and clarified in *Dillingham* and *De Buono*—that has upended the Court's prior precedent and has established in its place a whole new framework of presumptions and analysis for ERISA preemption cases. The parties asserting preemption of the Arkansas PPA, appellees ERISA plan sponsors, administrators, insurers, and HMO service providers, contend that the Supreme Court's most recent decisions have not worked a revolution in ERISA preemption analysis, but have instead helped clarify line-drawing at the peripheries, while leaving intact, even strengthening, the importance of the core concerns and inquiries of preemption analysis

3

articulated in prior precedent. Whether the Supreme Court's recent opinions constitute a "sea change" or instead command that we "stay the course" in ERISA preemption analysis, this court must strive to sail the course the Supreme Court has set.

## I. BACKGROUND

### A. Factual Background

In 1995, the Arkansas General Assembly passed two acts, Act 505 and Act 1193, that combined to form the so-called "Patient Protection Act," codified at ARK. CODE ANN. CH. 23-99. The Arkansas General Assembly's goal was to ensure

> that patients . . . be given the opportunity to see the health care provider of their choice. In order to assure the citizens of the State of Arkansas the right to choose the provider of their choice, it is the intent of the General Assembly to provide the opportunity of providers to participate in health benefit plans.

ARK. CODE ANN. § 23-99-202. Thus, the centerpiece of the legislation was ARK. CODE ANN. § 23-99-204, which provides as follows:

> (a)    A health care insurer shall not, directly or indirectly:
> (1)(A)  Impose a monetary advantage or penalty under a health benefit plan that would affect a beneficiary's choice among those health care providers who participate in the health benefit plan according to the terms offered.
> (B)  "Monetary advantage or penalty" includes:
>     (i) a higher co-payment;
>     (ii) a reduction in reimbursement for services; and
>     (iii) promotion of one (1) health care provider over another by these methods;
> (2)  Impose upon a beneficiary of health care services

4

under a health benefit plan any co-payment, fee, or condition that is not equally imposed upon all beneficiaries in the same benefit category, class, or co-payment level under the health benefit plan when the beneficiary is receiving services from a participating health care provider pursuant to that health benefit plan; or

(3) Prohibit or limit a health care provider that is qualified under § 23-99-203(d) and is willing to accept the health benefit plan's operating terms and conditions, schedule of fees, covered expenses, and utilization regulations and quality standards, from the opportunity to participate in that plan.

(b) Nothing in this subchapter shall prevent a health benefit plan from instituting measures designed to maintain quality and to control costs, including, but not limited to, the utilization of a gatekeeper system, as long as such measures are imposed equally on all providers in the same class.

ARK. CODE ANN. § 23-99-204. This section is known as the "Any Willing Provider" provision of the Arkansas PPA.

The Arkansas PPA defines many, but not all, of its key terms. "Health care providers" are defined to include twenty-seven categories of licensed or certified providers, including physicians and hospitals. ARK. CODE ANN. § 23-99-203(d). A "health benefit plan" is defined as "any entity or program that provides reimbursement, including capitation, for health care services." ARK. CODE ANN. § 23-99-203(c). "Health care insurer" is defined by the statute to include, but is not limited to, insurance companies, hospital and medical services corporations, health maintenance organizations, preferred provider organizations, physician hospital organizations, third-party administrators, and prescription benefit management companies authorized to administer, offer, or provide health benefit plans. ARK. CODE ANN. § 23-99-203(f).

5

The Arkansas PPA also includes a specific exclusion:

> The provisions of the [Arkansas PPA] shall not apply to self-funded or other health benefit plans that are exempt from state regulations by virtue of the federal Employee Retirement Income Security Act of 1974, as amended.

ARK. CODE ANN. § 23-99-209.

The plaintiffs below, appellees here, are "health care insurers" within the meaning of the Arkansas PPA. They brought this declaratory judgment action seeking a declaration that the Arkansas PPA is preempted by ERISA and an injunction prohibiting enforcement of the PPA. The defendants below, appellants here, are "health care providers" within the meaning of the Arkansas PPA[1] who sought admission to the plaintiffs' limited preferred provider panels, but were denied admission on the basis of "no need" findings by the plaintiffs. They sought declaratory and injunctive relief to enforce the Arkansas PPA.

## B. *The Decision Below*

The parties appeal from a decision of the United States District Court for the Eastern District of Arkansas, Western Division,[2] as amended, on cross-motions for summary judgment. *See Prudential Ins. Co. of Am. v. National Park Medical Ctr., Inc.*, 964 F. Supp. 1285 (E.D. Ark. 1997). In its original decision, filed January 31, 1997, the district court considered whether the Arkansas PPA "relate[s] to" ERISA,

---

[1] The State of Arkansas also intervened as a party defendant. However, on appeal, the State of Arkansas has proffered no separate argument in defense of the Arkansas PPA.

[2] The HONORABLE JAMES M. MOODY, United States District Judge for the Eastern District of Arkansas.

such that it is preempted pursuant to ERISA § 514(a), 29 U.S.C. § 1144(a), using the two-prong analysis employed by the Supreme Court in *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983), and subsequent decisions. The district court concluded, first, that the state law contains a "reference to" ERISA plans by singling out such plans for special treatment, in this case, an exemption from the burdens of the Arkansas PPA. In reaching this conclusion, the district court expressly relied on *Mackey v. Lanier Collection Agency & Serv.*, 486 U.S. 825 (1988), rather than *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125 (1992).

The district court also concluded that the Arkansas PPA had a "connection with" ERISA plans such that it was also preempted on this ground. In so doing, the court employed the seven factors used by this court in *Arkansas Blue Cross & Blue Shield v. St. Mary's Hosp., Inc.*, 947 F.2d 1341 (8th Cir. 1991), *cert. denied*, 504 U.S. 957 (1992). The district court found that the Arkansas PPA negated ERISA plan provisions; had a significant impact on primary ERISA entities; had a significant impact on plan structure; had a significant impact on plan administration; and the state law was inconsistent with ERISA provisions in various respects, although the district court did not find these inconsistencies particularly significant. One factor on which the district court found that the Arkansas PPA had insufficient impact to favor preemption was in direct or acute indirect economic impact. The court also found that the State of Arkansas had a legitimate interest in regulating health care for its citizens, such that consideration of whether the state law was an exercise of traditional state power did not favor preemption.

Considering all of these factors, the district court concluded that the Arkansas PPA "relates to" ERISA plans by virtue of making a reference to and having a connection with ERISA plans, and was therefore preempted. The court concluded

7

further that the Arkansas PPA was not "saved" from preemption by the ERISA "savings" clause, § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A), applying another two-prong test employed by the Supreme Court. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985). First, the court concluded that, as a matter of "common sense," the Arkansas PPA was not directed specifically at the insurance industry. Furthermore, relying on factors the Supreme Court has drawn from cases considering the meaning of the "business of insurance" under the McCarran-Ferguson Act, the district court concluded that the Arkansas PPA does not regulate the business of insurance by transferring or spreading a policyholder's risk; affects only indirectly the relationship between the insured and the insurer, by affecting the relationship between the insurer and health care providers; and was not limited solely to entities within the insurance industry. Thus, the Arkansas PPA did not fulfill either of the prongs of the ERISA "savings" clause test, and hence was indeed preempted.

The district court also found that the Arkansas PPA was preempted by the Federal Health Maintenance Organization Act, 42 U.S.C. § 300e-10. In light of these conclusions, the court found that the remaining issues—whether the Arkansas PPA was preempted by the Federal Employment Health Benefit Act, 5 U.S.C. § 8901-8914, and the plaintiffs' claims pursuant to 42 U.S.C. § 1983—were moot. The court therefore granted summary judgment in favor of the plaintiffs, permanently enjoined the defendants from enforcing the PPA, and denied the defendants' and intervenors' cross-motions for summary judgment.

In an amended order dated March 14, 1997, and filed on March 17, 1997, the district court held that the Arkansas PPA is preempted by ERISA only "'insofar as [it] . . . relate[s] to any employee benefit plan described in section 1003(a). . . .'"

Amended Order of March 14, 1997 (quoting 29 U.S.C. § 1144(a)). Similarly, the court ordered that the defendants are permanently enjoined from enforcing the Arkansas PPA only "'insofar as [it] . . . relate[s] to any employee benefit plan described in section 1003(a). . . .'" *Id.* (quoting 29 U.S.C. § 1144(a)).

The appellant health care providers have appealed the district court's conclusions that the Arkansas PPA is preempted by ERISA and not "saved" from preemption as a law that regulates insurance. Prudential Insurance Company of America cross-appealed the district court's amendment of the original order granting summary judgment.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has often stated that it will review the grant or denial of summary judgment *de novo*, applying the same standards used by the district court. *See, e.g., Union Pac. R.R. Co. v. Beckham*, 138 F.3d 325, 329 (8th Cir. 1998); *Kneibert v. Thomson Newspapers, Mich., Inc.*, 129 F.3d 444, 451 (8th Cir. 1997); *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1205 (8th Cir. 1997). Summary judgment is appropriate only if, after viewing the facts and the inferences to be drawn from them in the light most favorable to the nonmoving party, the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Beckham*, 138 F.3d at 329; *Kneibert*, 129 F.3d at 451; *Snow*, 128 F.3d at 1205. More specifically, "'[w]e review the District Court's decision on ERISA preemption de novo because it is a question of federal law involving statutory interpretation.'" *Wilson v. Zoellner*, 114 F.3d 713, 715 (8th Cir.

9

1997) (quoting *In Home Health, Inc., v. Prudential Ins. Co.*, 101 F.3d 600, 604 (8th Cir. 1996)).

## *B.  ERISA Preemption*

The court must now attempt to unravel the Gordian knot of the scope of ERISA "relate to" preemption,[3] the question that has so troubled the courts of appeals and the Supreme Court. *See Painter v. Golden Rule Ins. Co.*, 121 F.3d 436, 438-39 (8th Cir. 1997) (noting the Supreme Court's struggles with the scope of "relate to" preemption under § 1144(a)), *cert. denied*, ___ U.S. ___, ___ S. Ct. ___, 1998 WL 73018 (April 20, 1998).[4]  Pursuant to the express preemption provision of ERISA, section 514(a),

---

[3]Gordius, King of Phrygia, tied his chariot to a hitching post before the temple of an oracle with an intricate knot, which, it was prophesied, none but the future ruler of all Asia could untie.  *See, e.g., Funk and Wagnalls Standard Dictionary of Folklore, Mythology, and Legend* 460 (Maria Leach, ed., Funk & Wagnalls, 1972); *Bulfinch's Mythology* 44 (Richard P. Martin, ed., 1991).  In the course of his conquests, Alexander the Great came to Phrygia, and, frustrated with his inability to untangle the "Gordian knot," simply sliced through it with his sword.  His subsequent success in his Asian campaign has been taken to mean that his solution to the "Gordian knot" fulfilled the prophesy.  *See, e.g., Funk and Wagnalls Standard Dictionary of Folklore, Mythology, and Legend* 460 (Maria Leach, ed., Funk & Wagnalls, 1972); *Bulfinch's Mythology* 44 (Richard P. Martin, ed., 1991).  However, this court does not have the luxury of applying a sword to the problem of interpretation of the scope of ERISA preemption, no matter how troubled this and other courts may be by the question.

[4]In *Painter*, this court noted that, in addition to or instead of "relate to" preemption, some ERISA cases involve the distinct question of conflict preemption—whether a state law is preempted because it conflicts with a specific portion of the complex ERISA statute.  If there is a conflict, state law is preempted, *whether or not* "the statutory phrase 'relate to' provides

(continued...)

10

codified at 29 U.S.C. § 1144(a), the Arkansas PPA, like any other state law, is preempted "insofar as [it] may now or hereafter relate to any [ERISA] employee benefit plan."[5] But does the Arkansas PPA "relate to" ERISA in a prohibited way?

Congress included the express preemption clause of § 1144(a) in ERISA to provide for "'the displacement of State action in the field of private employee benefit programs.'" *Wilson*, 114 F.3d at 716 (quoting *Morstein v. National Ins. Servs., Inc.*, 93 F.3d 715, 719 n.6 (11th Cir. 1996) (en banc), *cert. denied*, ___ U.S. ___, 117 S. Ct. 769 (1997), which in turn quotes 120 Cong. Rec. 29,942 (1974) (comments of Senator Javits)). Yet, Congress did not define what it meant by state laws that "relate to" an ERISA benefit plan anywhere in the statute.

As this court noted in *Wilson*,

---

[4] (...continued)
> further and additional support for the pre-emption claim."
> *Boggs v. Boggs*, ___ U.S. ___, ___, 117 S. Ct. 1754, 1761,
> 138 L. Ed. 2d 45 (1997).

*Painter*, 121 F.3d at 439 (emphasis in the original). In *Painter*, in the court's view, the case before it was one of "conflict preemption." *Id.* However, neither the parties nor the district court in the case presently before this court ever suggested the applicability of "conflict preemption." Thus, we will consider only the "relate to" species of ERISA preemption here.

[5] This provision of ERISA states, in its entirety, as follows:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

29 U.S.C. § 1144(a).

11

> In analyzing this clause, the Supreme Court has "long acknowledged that ERISA's pre-emption provision is clearly expansive." *California Division of Labor Standards Enforcement v. Dillingham Constr.*, [519] U.S. [316], ___, 117 S. Ct. 832, 837, 136 L. Ed. 2d 791 (1997) (quotations and citations omitted). The Supreme Court has variously described the ERISA preemption clause as having "a broad scope, and an expansive sweep, and [as being] broadly worded, deliberately expansive, and conspicuous for its breadth." *Id.* (quotations and citations omitted).

*Wilson*, 114 F.3d at 716. However, the Supreme Court has also made clear, particularly in its most recent decisions, that the ERISA preemption clause cannot be read "to 'extend to the furthest stretch of its indeterminacy.'" *De Buono*, ___ U.S. at ___, 117 S. Ct. at 1751 (quoting *Travelers*, 514 U.S. at 655).

In addition to recognizing these general principles, the Supreme Court has also provided more concrete guidance on the scope of "relate to" preemption by formulating a two-part inquiry to determine whether a state law "relate[s] to" an employee benefit plan covered by ERISA. *See Dillingham*, 519 U.S. at ___, 117 S. Ct. at 837; *Wilson*, 114 F.3d at 716.

> A "law 'relate[s] to' a covered employee benefit plan for purposes of § 514(a) 'if it [1] has a connection with or [2] reference to such a plan.'" *District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 129, 113 S. Ct. 580, 583, 121 L. Ed. 2d 513 (1992) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97, 103 S. Ct. 2890, 2899-2900, 77 L. Ed. 2d 490 (1983)).

*Dillingham*, 519 U.S. at ___, 117 S. Ct. at 837; *accord Travelers*, 514 U.S. at 656; *Wilson*, 114 F.3d at 716. The nature of this two-prong inquiry must be explored in more detail.

12

## 1.    *The effect of Travelers*

The critical question put by the parties in this case is the effect of the Supreme Court's decision in *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995), upon this two-prong ERISA preemption analysis.  The appellants suggest that *Travelers* largely supplanted the entire two-prong inquiry, replacing it with a "starting presumption" that state laws will not be preempted, and relying on determinations of congressional intent to preempt only those laws that are of the type Congress intended ERISA to preempt.  This inquiry, appellants assert, depends upon the purpose and effects of the state statute.  The appellees counter that *Travelers* and its progeny have only put limits on the broadest scope of ERISA preemption without altering the essential inquiries stated in prior precedent.

In *Travelers*, the Supreme Court considered whether ERISA preempted "[a] New York statute [that] require[d] hospitals to collect surcharges from patients covered by a commercial insurer but not from patients insured by a Blue Cross/Blue Shield plan, and [that also] subject[ed] certain health maintenance organizations (HMOs) to surcharges that var[ied] with the number of Medicaid recipients each enroll[ed]." *Travelers*, 514 U.S. at 649.  As appellants contend, the Court did begin its discussion of the preemption issue by noting that "we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law." *Id.* at 654.  The Court also reiterated the assumption that Congress did not intend to bar state action in fields of traditional state regulation or historic police powers. *Id.* at 655.  Appellants focus particularly on the following passage:

> Since pre-emption claims turn on Congress's intent, *Cipollone [v. Liggett Group, Inc.*, 505 U.S.  504], ___, 112 S. Ct., at 2617-18; *Shaw*, *supra*, at 95, 103 S. Ct., at 2898,

we begin as we do in any exercise of statutory construction with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act in which it occurs. *See, e.g., Ingersoll-Rand*, 498 U.S., at 138, 111 S. Ct., at 482. The governing text of ERISA is clearly expansive. Section 514(a) [29 U.S.C. § 1144(a)] marks for pre-emption "all state laws insofar as they . . . relate to any employee benefit plan" covered by ERISA, and one might be excused for wondering, at first blush, whether the words of limitation ("insofar as they . . . relate") do much limiting. If "relate to" were taken to extend to the furthest stretch of indeterminacy, then for all practical purposes pre-emption would never run its course, for "[r]eally, universally, relations stop nowhere," H. James, Roderick Hudson xli (New York ed., World's Classics 1980). But that, of course, would be to read Congress's words of limitation as mere sham, and to read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality. *That said, we have to recognize that our prior attempt to construe the phrase "relate to" does not give us much help drawing the line here.*

*Travelers*, 514 U.S. at 655 (emphasis added). The appellants contend that the highlighted statement shows that the Supreme Court's decision in *Travelers* constituted a "sea change" in ERISA preemption analysis.

However, we do not read *Travelers* to reject all of its prior precedent on the scope of ERISA preemption or as a wholesale rejection of the mode of analysis employed in the Court's prior precedent. Although in *Travelers* the Court found its prior attempts to construe the phrase "relate to" did not give it much help drawing the line *in that particular case*, *id.* ("[W]e have to recognize that our prior attempt to construe the phrase 'relate to' does not give us much help drawing the line *here*"; emphasis added), the Court's analysis in *Travelers* nonetheless began with precisely

14

the two-prong inquiry established years before in *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983). *Travelers*, 514 U.S. at 656 ("In *Shaw*, we explained that '[a] law "relates to" an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.' 463 U.S., at 96-97, 103 S. Ct., at 2900.").

The Court quickly dispensed with the applicability of the "reference to" prong of the inquiry in the case before it, however:

> The latter alternative, at least, can be ruled out. The surcharges are imposed upon patients and HMOs, regardless of whether the commercial coverage or membership, respectively, is ultimately secured by an ERISA plan, private purchase, or otherwise, with the consequence that the surcharge statutes cannot be said to make "reference to" ERISA plans in any manner. *Cf. Greater Wash. Bd. of Trade*, 506 U.S., at ___, 113 S. Ct., at 583 (striking down District of Columbia law that "specifically refers to welfare benefit plans regulated by ERISA and on that basis alone is pre-empted").

*Travelers*, 514 U.S. at 656. Thus, the "reference to" inquiry was unhelpful *in that case*, because that alternative could be so completely "ruled out." *Id.*

This conclusion, however, still left the Court with the second prong of the inquiry, the "connection with" prong. *Id.* It was with respect to this prong of the inquiry that the decision in *Travelers* arguably changed the direction of or emphasis in ERISA preemption analysis, because the Court found that as to the "connection with" prong,

> an uncritical literalism is no more help than in trying to construe "relate to." For the same reasons that infinite relations cannot be the measure of pre-emption, neither can infinite connections. We simply must go beyond the

15

unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive.

*Id.* Thus, where there was no "reference to" ERISA in the state law, the court's further preemption inquiry was governed by the objectives of the ERISA statute as a guide to what state laws Congress intended to preempt.

The Court's subsequent decisions also do not indicate a wholesale abandonment of prior precedent concerning the "reference to" prong of the inquiry. For example, in *Dillingham*, the Court again stated the two-part inquiry for ERISA "relate to" preemption cases. *Dillingham*, ___ U.S. at ___, 117 S. Ct. at 837. The Court's explanation of the "reference to" prong of the analysis relied entirely on pre-*Travelers* precedent:

> Under the ["reference to"] inquiry, we have held pre-empted a law that "impos[ed] requirements by reference to [ERISA] covered programs," *Greater Washington Bd. of Trade*, *supra*, at 130-31, 113 S. Ct., at 584; a law that specifically exempted ERISA plans from an otherwise generally applicable garnishment provision, *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 828, n.2, 829-830, 108 S. Ct. 2182, 2184, n.2, 2185-2186, 100 L. Ed. 2d 836 (1988); and a common-law cause of action premised on the existence of an ERISA plan, *Ingersoll-Rand Co.*, *supra*, at 140, 111 S. Ct., at 483-484. Where a State's law acts immediately and exclusively upon ERISA plans, as in *Mackey*, or where the existence of ERISA plans is essential to the law's operation, as in *Greater Washington Bd. of Trade* and *Ingersoll-Rand*, that "reference" will result in pre-emption.

*Dillingham*, 117 S. Ct. at 837-38. Without once referring to the decision in *Travelers* or to a presumption against preemption, the Court in *Dillingham* concluded that the

California apprentice wage law at issue in that case did not make a prohibited "reference to" ERISA, because approved apprenticeship programs did not necessarily need to be ERISA plans. *Id.* at 838. Apparently, nowhere did the California act make an express reference to ERISA. Furthermore,

> [The California apprentice wage law] "functions irrespective of . . . the existence of an ERISA plan." An apprenticeship program meeting the substantive standards set forth in the Fitzgerald Act regulations can be approved whether or not its funding apparatus is of a kind as to bring it under ERISA. [The California law] is indifferent to the funding, and attendant ERISA coverage, of apprenticeship programs. Accordingly, California's prevailing wage statute does not make reference to ERISA plans.

*Dillingham*, ___ U.S. at ___, 117 S. Ct. at 839.

It was when the Court turned to analysis of the "connection with" prong of the inquiry that the standards stated in *Travelers*, and specific citation of that authority, figured prominently. *Id.* at 839-42. Indeed, it was only when the Court turned from the "reference to" prong of the inquiry to the "connection with" prong that it noted that *Travelers* had refocused the inquiry:

> A law that does not refer to ERISA plans may yet be preempted if it has a "connection with" ERISA plans. Two terms ago, we recognized that an "uncritical literalism" in applying this standard offered scant utility in determining Congress' intent as to the extent of § [1144(a)]'s reach." *Travelers*, 514 U.S., at [656], 115 S. Ct., at 1677. Rather, to determine whether a state law has the forbidden connection, we look both to "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive," *ibid.*, as well as to the nature of the effect of the state law on ERISA plans, *id.*, at ___, 115 S. Ct., at 1677.

17

*Dillingham*, ___ U.S. at ___, 117 S. Ct. at 838. Thus, while the Court in *Dillingham* recognized a significant change in the mode of analysis under the "connection with" prong of the inquiry in *Travelers*, it saw no such change in the analysis under the "reference to" prong.

Furthermore, in *De Buono*, although the Court explained that the decision in *Travelers* had "unequivocally concluded" that the "relate to" language was not "intended to modify 'the starting presumption that Congress does not intend to supplant state law,'" *De Buono*, ___ U.S. at ___, 117 S. Ct. at 1751 (quoting *Travelers*, 514 U.S. at 654), the Court still identified as among the types of state laws that Congress intended to supersede "one[s] in which the state statute contains provisions that expressly refer to ERISA or ERISA plans." *Id.* at 1752 & n.15 (citing *Mackey*, 486 U.S. at 828-30, and *Greater Wash. Bd. of Trade*, 506 U.S. at 130-31, and finding the law in question in that case was not one that "contains provisions that expressly refer to ERISA or ERISA plans").

Thus, we conclude that although *Travelers* certainly reaffirmed—in the context of ERISA preemption—the importance of the presumption that Congress did not intend to supplant state law unless that intention was clear, that refocusing of the preemption inquiry was specifically in the context of the "connection with" prong of the inquiry. Nothing in *Travelers* or its recent progeny supplants the "reference to" prong of the ERISA preemption analysis as stated in pre-*Travelers* precedent, specifically *Mackey* and *Greater Washington Board of Trade*. To put it another way, we believe that the presumption that Congress does not intend to supplant state law is necessarily overcome when the state law has an inappropriate "reference to" ERISA or ERISA plans, as such an improper reference is defined in pre-*Travelers* precedent. *See*

18

*Travelers*, 514 U.S. at 655-56; *accord De Buono*, ___ U.S. at ___, 117 S. Ct. at 1752 & n.15; *Dillingham*, ___ U.S. at ___, 117 S. Ct. at 839.  Therefore, we turn to the question of whether the Arkansas PPA has a prohibited "reference to" ERISA or ERISA plans.

### 2.      *"Reference to" ERISA in the Arkansas PPA*

A state law has a prohibited "reference to" ERISA or ERISA plans when that law (1) "'impos[es] requirements by reference to [ERISA] covered programs,'" *Dillingham*, ___ U.S. at ___, 117 S. Ct. at 837 (quoting *Greater Wash. Bd. of Trade*, 506 U.S. at 130-31); (2) "specifically exempt[s] ERISA plans from an otherwise generally applicable [statute]," *id.* (citing *Mackey*, 486 U.S. at 828 n.2); or (3) premises a cause of action on the existence of an ERISA plan, *id.* (citing *Ingersoll-Rand*, 498 U.S. at 140).  Thus, "[w]here a State's law acts immediately and exclusively upon ERISA plans, as in *Mackey*, or where the existence of ERISA plans is essential to the law's operation, as in *Greater Washington Board of Trade* and *Ingersoll-Rand*, that "reference" will result in pre-emption."  *Id.* at 837-38; *accord Wilson*, 114 F.3d at 716-17.

The appellants contend that the Arkansas PPA makes no forbidden "reference to" ERISA, although it expressly states that its provisions "shall not apply to self-funded or other health benefit plans that are exempt from state regulation by virtue of the federal Employee Retirement Income Security Act of 1974, as amended."  ARK. CODE ANN. § 23-99-209.  First, they contend that the Arkansas PPA exempts only *self-funded* ERISA plans, not insured ERISA plans, and hence merely restates ERISA's so-called "deemer clause."  The "deemer clause" states that no self-funded ERISA plan "shall be deemed to be an insurance company or other insurer . . . for purposes of any law of any State purporting to regulate insurance companies, insurance contracts,

19

banks, trust companies, or investment companies." 29 U.S.C. § 1144(b)(2)(B). They contend further that the Arkansas PPA does not single out any plans, ERISA or non-ERISA, because the PPA does not regulate plans at all, but only insurers.

Appellees counter that the express exemption for plans regulated by ERISA in the Arkansas PPA is not limited solely to self-funded ERISA plans, because it also specifically encompasses "other health benefit plans." Further, they contend that ARK. CODE ANN. § 23-99-209 does not parallel ERISA's "deemer clause," because it plainly is not limited to insurance companies or insured relationships. In any event, they contend that the Arkansas PPA has a forbidden "reference to" ERISA, because in § 23-99-209, the Arkansas PPA singles out ERISA plans for special treatment. Finally, they contend that throughout the Arkansas PPA, statutory provisions belie the assertion that the act only regulates insurers, not plans.

In *Wilson*, this court applied the considerations identified in *Dillingham* to the question of whether the Missouri common-law tort of negligent misrepresentation contained a forbidden "reference to" ERISA, revisiting its prior holding in *In Home Health, Inc. v. Prudential Ins. Co.*, 101 F.3d 600 (8th Cir. 1996):

> Upon considering th[e] elements of the tort, we concluded "that the state common law on negligent misrepresentation is of general application. It does not actually or implicitly refer to ERISA plans. The state law on misrepresentation . . . is of general application as it makes no reference to and functions irrespective of the existence of an ERISA plan." [*In Home Health*, 101 F.3d] at 605 n.6 (quotations and citations omitted). Because "the existence of ERISA plans is not essential to the operation of Missouri state common-law tort of negligent misrepresentation, *Dillingham*, ___ U.S. at ___, 117 S. Ct. at 838, and because the tort of negligent misrepresentation does not "impos[e] requirements by reference to ERISA covered programs," *id.*

20

at ___, 117 S. Ct. at 837 (quotations, citations, and alterations omitted), nor "acts immediately and exclusively upon ERISA plans," *id.* at ___, 117 S. Ct. at 838, Wilson's tort action for negligent misrepresentation against Zoellner is not preempted by ERISA on the basis of any reference to ERISA.

*Wilson*, 114 F.3d at 717.

Unlike the common-law tort action at issue in *Wilson*, however, the Arkansas PPA does, both actually and implicitly, refer to ERISA plans. *Id.* Again, the Arkansas PPA expressly states that its provisions "shall not apply to self-funded or other health benefit plans that are exempt from state regulation by virtue of the federal Employee Retirement Income Security Act of 1974, as amended." ARK. CODE ANN. § 23-99-209. In keeping with post-*Travelers* precedent, and the pre-*Travelers* precedent specifically embraced in *Travelers* and its progeny, this reference to ERISA is sufficient to preempt the Arkansas PPA.

In *Mackey*, the Supreme Court held that a Georgia garnishment statute that "singles out ERISA employee welfare benefit plans for different treatment under state garnishment procedures, is pre-empted under § [1144(a)]." *Mackey*, 486 U.S. at 830. The Court stated, "The state statute's express reference to ERISA plans suffices to bring it within the federal law's pre-emptive reach." *Id.* Next, in *Ingersoll-Rand*, the Supreme Court considered whether ERISA preempted a Texas law authorizing a cause of action for wrongful discharge to avoid making contributions to an employee's pension fund. *Ingersoll-Rand*, 498 U.S. at 135. In that case, the Court reaffirmed *Mackey*'s recognition that "'we have virtually taken it for granted that state laws which are "specifically designed to affect employee benefit plans" are pre-empted under § [1144(a)].'" *Ingersoll-Rand*, 498 U.S. at 140 (quoting *Mackey*, 486 U.S. at 829).

21

The Court explained, "In *Mackey* the statute's express reference to ERISA plans established that it was so designed; consequently, it was pre-empted." *Id.* The Court then held that the Texas common-law cause of action it was asked to consider was preempted, because "there simply is no cause of action if there is no plan." *Id.* In *Greater Washington Board of Trade*, the Court took the "reference to" analysis one step further, finding that a District of Columbia law that specifically referred to benefit plans that were *regulated* by ERISA was preempted "on that basis alone." *Greater Wash. Bd. of Trade*, 506 U.S. at 130. The Court reasoned thus:

> The health insurance coverage that [the District of Columbia law] requires employers to provide for eligible employees is measured by reference to "the existing health insurance coverage" provided by the employer and "shall be at the same benefit level." D.C. Code Ann. § (a-1)(1) and (3) (Supp. 1992). The employee's "existing health insurance coverage," in turn, is a welfare benefit plan under ERISA § 3(a), because it involves a fund or program maintained by an employer for the purpose of providing health benefits for the employee "through the purchase of insurance or otherwise." § 3(a), 29 U.S.C. § 1002(1). Such employer-sponsored health insurance programs are subject to ERISA regulation, *see* § 4(a), 29 U.S.C. § 1003(a), and any state law imposing requirements by reference to such covered programs must yield to ERISA.

*Id.* at 130-31. These precedents require the conclusion that the Arkansas PPA is preempted.

First, § 23-99-209 of the Arkansas PPA undeniably makes an express reference to ERISA and attempts to exclude from coverage of the PPA at least some ERISA

plans.[6] Thus, it "singles out ERISA employee welfare benefit plans for different treatment under state [law], [and therefore] is pre-empted under § [1144(a)]." *Mackey*, 486 U.S. at 830. As in *Mackey*, "[t]he state statute's express reference to ERISA plans suffices to bring it within the federal law's pre-emptive reach." *Id.* The Arkansas PPA is """specifically designed to affect employee benefit plans,""" even if the effect is to exclude them from coverage of the PPA, and thus the PPA "'[is] pre-empted under § [1144(a)].'" *Ingersoll-Rand*, 498 U.S. at 140 (quoting *Mackey*, 486 U.S. at 829). To put it another way, the Arkansas PPA "specifically exempt[s] ERISA plans from an otherwise generally applicable [statute]," and it is consequently preempted. *Dillingham*, ___ U.S. at ___, 117 S. Ct. at 837 (citing *Mackey*, 486 U.S. at 828 n.2).

Even if it were true that § 23-99-209 of the Arkansas PPA merely reflects ERISA's "deemer clause," an assertion we find unpersuasive, that would be immaterial to our conclusion that § 23-99-209's express reference to ERISA plans "bring[s] it within the federal law's pre-emptive reach." *Mackey*, 486 U.S. at 830. The fact that a state law is enacted to help effectuate ERISA's provisions or is in accord with ERISA's dictates "is not enough to save the state law from pre-emption." *Id.* at 829. "'The pre-emption provision [of ERISA] . . . displace[s] all state laws that fall within its sphere, even including state laws that are consistent with ERISA's substantive requirements.'" *Id.* (quoting *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985)); *accord Greater Wash. Bd. of Trade*, 506 U.S. at 130 (also citing *Metropolitan Life Ins. Co.*, 471 U.S. at 739); *Ingersoll-Rand*, 498 U.S. at 139 ("Pre-

---

[6]We find it unnecessary to address the appellants' argument that the Arkansas PPA attempts to exclude from its coverage only *self-funded* ERISA plans; it suffices, as we read Supreme Court precedent, that the Arkansas PPA attempts to exempt *any* ERISA plans.

emption is also not precluded simply because a state law is consistent with ERISA's substantive requirements," also citing *Metropolitan Life Ins. Co.*, 471 U.S. at 739). In short, "legislative 'good intentions' do not save a state law within the broad pre-emptive scope of § [1144(a)]." *Id.* at 830.

Second, appellants' contentions notwithstanding, the Arkansas PPA has several provisions that make implicit reference to ERISA, *see Wilson*, 114 F.3d at 717 (considering both actual and implicit reference to ERISA or ERISA plans), through regulation of "health benefit plans" that are necessarily subject to ERISA regulation. *Cf. Greater Wash. Bd. of Trade*, 506 U.S. at 130-31. For example, the Arkansas PPA provides that "[i]t is a violation of this subchapter for any health care insurer or other person or entity to provide any *health benefit plan* providing for health care services that does not conform to this chapter." ARK. CODE ANN. § 23-99-206 (emphasis added). Similarly, the Arkansas PPA was intended "to provide the opportunity of providers to participate in *health benefit plans*," ARK. CODE ANN. § 23-99-202 (emphasis added), and the Act states that "[n]othing in this subchapter shall prevent a *health benefit plan* from instituting measures designed to maintain quality and to control costs . . . so long as such measures are imposed equally on all providers in the same class." ARK. CODE ANN. § 23-99-204(b) (emphasis added). Thus, it cannot be said that the Arkansas PPA "functions irrespective of . . . the existence of an ERISA plan." *Dillingham*, ___ U.S. at ___, 117 S. Ct. at 839; *Wilson*, 114 F.3d at 717; *In Home Health*, 101 F.3d at 605 n.6. Rather, the Arkansas PPA is "specifically designed to affect employee benefit plans," *Ingersoll-Rand*, 498 U.S. at 140 (quoting *Mackey*, 486 U.S. at 829), it "'impos[es] requirements by reference to [ERISA] covered programs,'" *Dillingham*, ___ U.S. at ___, 117 S. Ct. at 837 (quoting *Greater Wash.*

24

*Bd. of Trade*, 506 U.S. at 130-31), and "the existence of ERISA plans is essential to the law's operation." *Id.* at 837-38; *accord Wilson*, 114 F.3d at 716-17.

Finally, by letter pursuant to FED. R. APP. P. 28(j), the appellants recently brought to the court's attention the decision of the Ninth Circuit Court of Appeals in *Washington Physicians Serv. Ass'n v. Gregoire*, ___ F.3d ___, 1998 WL 318759 (9th Cir. June 18, 1998), which they assert directly relates to their argument that the Arkansas PPA regulates health care insurers, not health benefit plans. In *Gregoire*, the Ninth Circuit Court of Appeals concluded that Washington's so-called "Alternative Provider Statute" was not preempted by ERISA. *Gregoire*, ___ F.3d at ___, 1998 WL 318759 at *1. The court found that the Washington statute did not "relate to" ERISA plans in the most obvious way by referring to or acting directly upon such plans. *Id.* at ___, 1998 WL 318759 at *3. However, unlike the Arkansas statute, which is not so restricted, as explained above, the Washington statute made clear that the term "health plans" referred only to plans offered by a "health carrier," not a benefit plan offered by an employer, and defined "health carrier" to include only a disability insurer, a health care service contractor, or an HMO, and excluded employer-sponsored, self-funded health plans. *Id.* Nor did the Washington act make the kind of express attempt to exclude ERISA-regulated plans found in the Arkansas PPA in ARK. CODE ANN. § 23-99-209, because it simply identified the very narrow "health plans" to which it referred, which were not ERISA-regulated plans, even though the way the Washington act was drawn was "quite obviously intended to save the Act from ERISA preemption." *Id.* Indeed, the Ninth Circuit Court of Appeals recognized that the narrow language of the Washington act distinguished the case "from the numerous cases that have found a 'reference' to ERISA plans in a state's regulation of health plans," in which "the state laws . . . all included ERISA plans in the definition of 'health plan' or otherwise

25

expressly referred to ERISA plans." *Id.* at ___, 1998 WL 318759 at *4. Thus, "[b]ecause the [Washington] Act is different from these other state laws in that it does not expressly refer to ERISA plans and does not operate directly on them," the Ninth Circuit Court of Appeals did "not find this string of precedent relevant," and held "that the [Washington] Act does not have a 'reference' to ERISA plans." *Id.* Again, this court holds that the Arkansas PPA does have both express and implicit references to ERISA plans.

Thus, the Arkansas PPA makes impermissible "reference to" ERISA or ERISA plans, and as such is preempted by 29 U.S.C. § 1144(a). *Dillingham*, ___ U.S. at ___, 117 S. Ct. at 837-38; *accord Wilson*, 114 F.3d at 716-17. Because the PPA is preempted under the "reference to" prong of the ERISA preemption analysis, we find it unnecessary to reach the question of whether it is also preempted under the "connection with" prong. However, having concluded that the Arkansas PPA is preempted, we turn to the question of whether it is nonetheless "saved" from ERISA preemption as a state law that regulates insurance.

### C. The "Savings" Clause

Although the Arkansas PPA would otherwise be preempted, it will escape the effects of that preemption if it falls within ERISA's so-called "savings" clause, § 514(b)(2)(A), codified at 29 U.S.C. § 1144(b)(2)(A). *See, e.g., Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45 (1987) ("To summarize the pure mechanics of [§ 514(a) and § 514(b)]: If a state law 'relate[s] to . . . employee benefit plan[s],' it is pre-empted. § 514(a). The saving clause excepts from the pre-emption clause laws that 'regulat[e] insurance.' § 514(b)(2)(A)."); *Metropolitan Life Ins. Co.*, 471 U.S. at 733 ("While § 514(a) of ERISA broadly pre-empts state laws that relate to an employee-

benefit plan, that pre-emption is substantially qualified by an 'insurance savings clause,' § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A). . . ."); *United of Omaha v. Business Men's Assur. Co.*, 104 F.3d 1034, 1039 (8th Cir. 1997). The "savings" clause provides that "[n]othing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance . . . ." 29 U.S.C. § 1144(b)(2)(A); *see also Metropolitan Life Ins. Co.*, 471 U.S. at 733; *United of Omaha*, 104 F.3d at 1039 ("The savings clause excepts from preemption certain categories of state law, including state law that regulates insurance.").

The appellants contend that the district court erred when it held that the Arkansas PPA was not "saved" from ERISA preemption, because the PPA did not "regulate insurance." They contend that the court's error arose from its failure to follow *United States Dep't of Treasury v. Fabe*, 508 U.S. 491 (1993), which they assert is the Supreme Court's most recent decision addressing the manner in which courts are to determine whether a state law regulates insurance. They argue that *Fabe* departed from rigid application of the tests found in *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205 (1979), *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982), and *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985), instead applying a broad interpretation of which state laws regulate the "business of insurance" outside of the antitrust arena. They assert that under this broad interpretation, the Arkansas PPA is unequivocally a law affecting the "business of insurance," and as such is saved from ERISA preemption.

The appellees once again disagree with the appellants' assertion that the rules have changed. They argue that *Fabe* is factually unrelated and legally irrelevant to the question of the scope of the ERISA savings clause. They point out that the definition of "health care insurer" under the Arkansas PPA is definitely not limited to "insurance

companies" and that as a matter of both common sense and application of the factors cited in *Royal Drug*, *Pireno*, and *Metropolitan Life Insurance*, the Arkansas PPA is not a law regulating insurance. Therefore, they argue that the district court correctly held that the Arkansas PPA is not "saved" from preemption.

Whatever its import for the present case, *Fabe* is not a case directly considering the scope of the ERISA "savings" clause; rather, it was a case considering whether an Ohio law establishing priority of claims for an insolvent insurance company was exempt by virtue of the McCarran-Ferguson Act from preemption by the federal priority statute, 31 U.S.C. § 3713. *Fabe*, 508 U.S. at 493. Therefore, we look first to Supreme Court decisions specifically interpreting the scope of the ERISA "savings" clause.

### 1. *Scope of the ERISA "savings" clause*

The Supreme Court first considered the scope of the ERISA "savings" clause in *Metropolitan Life*:

> [T]he sphere in which § 514(a) operates [to preempt state law] was explicitly limited by § 514(b)(2). The insurance saving clause preserves any state law "which regulates insurance, banking, or securities." The two pre-emption sections, while clear enough on their faces, perhaps are not a model of legislative drafting, for while the general pre-emption clause broadly pre-empts state law, the saving clause appears broadly to preserve the States' lawmaking power over much of the same regulation. While Congress occasionally decides to return to the States what it has previously taken away, it does not normally do both at the same time.

*Metropolitan Life Ins. Co.*, 471 U.S. at 739-40. In determining the proper scope of the savings clause, the Court began by taking a "common-sense" view of the question of whether a state law was one "which regulates insurance." *Id.* at 740. The Court then

28

drew upon cases interpreting the scope of the McCarran-Ferguson Act, which had identified three criteria relevant to determining whether a particular practice falls within that Act's reference to the "business of insurance." *Id.* at 743. The three criteria suggested by those cases were the following:

> "*first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry." *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129, 102 S. Ct. 3002, 3008, 73 L. Ed. 2d 647 (1982) (emphasis in the original). See also *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205 (1979).

*Metropolitan Life Ins. Co.*, 471 U.S. at 743. The Court noted further that the focus of the statutory term under the McCarran-Ferguson Act was "'the relationship between the insurance company and the policyholder.'" *Id.* at 744 (quoting *SEC v. National Sec., Inc.*, 393 U.S. 453, 460 (1969)).

These principles were reaffirmed two years later in *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48-49 (1987) (citing *Metropolitan Life Ins. Co.*, 471 U.S. at 740). In that case, the Court explained further that "[a] common-sense view of the word 'regulates' would lead to the conclusion that in order to regulate insurance, a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry." *Id.* at 50. Even though the Mississippi Supreme Court had identified the state law in question in that case, the Mississippi common law of bad faith, with the insurance industry, "the roots of this law are firmly planted in the general principles of Mississippi tort and contract law." *Id.* at 50. Turning to the McCarran-Ferguson factors, the Court concluded that the Mississippi law did not "effect a

spreading of policyholder risk." *Id.* Although the state common law did concern "the policy relationship between the insurer and the insured," the Court found that "[t]he connection to the insurer-insured relationship is attenuated at best," because it did not "define the terms of the relationship between the insurer and the insured," and hence was "no more 'integral' to the insurer-insured relationship than any State's general contract law is integral to a contract made in that State." *Id.* at 50-51. Finally, because the state common-law had developed from general principles of tort and contract law available in any breach-of-contract case, it was not limited to entities within the insurance industry. *Id.* at 51. In addition to the factors stated in *Metropolitan Life*, the Court also considered the role of the savings clause in ERISA as a whole, concluding that, because the common-law cause of action addressed remedies for improper processing of a claim for benefits, the understanding of the savings clause "must be informed by the legislative intent concerning" comparable portions of the ERISA statute, its enforcement provisions. *Id.* at 51-52. The Court concluded that it was not the intent of Congress to "save" from preemption conflicting remedies provisions of state law. *Id.* at 53-56.

The appellants assert that *United States Dep't of Treasury v. Fabe*, 508 U.S. 491 (1993)*,* changed this analysis, because it changed the way in which courts are to determine which state laws regulate insurance under the McCarran-Ferguson Act. In *Fabe*, the Court noted that *Royal Drug* and *Pireno*—the cases from which the Court in *Metropolitan Life* had drawn the three factors for determining what is the "business of insurance" within the meaning of the ERISA savings clause—both involved the scope of the "antitrust immunity" located in the second clause of § 2(b) of the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), rather than the first clause, which commits to the states laws "enacted . . . for the purpose of regulating the business of

30

insurance."[7]  *Fabe*, 508 U.S. at 504.  The Court concluded that the first clause was "not so narrowly circumscribed," because the Court refused to equate "laws 'enacted . . . for the purpose of regulating the business of insurance' with the 'business of insurance' itself."  *Id.*  The Court concluded further that laws "enacted . . . for the purpose of regulating the business of insurance" "necessarily encompasses more than just the 'business of insurance.'"  *Id.* at 505.

While it is not for us to quibble with the Supreme Court's interpretation of the McCarran-Ferguson Act in *Fabe*, we can observe that that decision's interpretation of laws "enacted . . . for the purpose of regulating the business of insurance" in the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), does not supplant that Court's own interpretation of the meaning of "business of insurance" or "law of any State which regulates insurance" in the ERISA savings clause.  29 U.S.C. § 1144(b)(2)(A).  We decline to adopt *Fabe*'s interpretation of laws "enacted . . . for the purpose of regulating the business of insurance" in the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), as necessarily the interpretation the Supreme Court would adopt for the ERISA savings clause if it were now given the opportunity to rethink *Metropolitan*

---

[7]The two clauses of the McCarran-Ferguson Act to which the Court referred state the following:

> No Act of Congress shall be construed to invalidate, impair, or supersede any *law enacted by any State for the purpose of regulating the business of insurance*, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance:  *Provided*, That after June 30, 1948 the [antitrust acts], shall be applicable to the *business of insurance* to the extent that such business is not regulated by State law.

15 U.S.C. § 1012(b) (emphasis added).

31

*Life*.[8]  The Supreme Court has already expressly interpreted the meaning of the pertinent terms of the ERISA savings clause, and it is that interpretation we will apply here.

As this court explained in its most recent decision addressing the scope of the ERISA "savings" clause,

> The Supreme Court has explained that a state law "regulates insurance" if (1) it is directed specifically toward the insurance industry and (2) it applies to the "business of insurance" within the meaning of the McCarran-Ferguson Act, which gives to the states the authority to regulate the business of insurance, *see* 15 U.S.C. §§ 1011-1015. *Pilot Life*, 481 U.S. at 48, 107 S. Ct. at 1553; *Metropolitan Life*, 471 U.S. at 742-43, 105 S. Ct. at 2390-91; *Baxter v. Lynn*, 886 F.2d 182, 185 (8th Cir. 1989). A law applies to the business of insurance under the McCarran-Ferguson Act if it (1) has the effect of transferring or spreading the policyholder's risk; (2) is an integral part of the policy relationship between the insurer and the insured; and (3) is limited to entities within the insurance industry. *Metropolitan Life*, 471 U.S. at 743, 105 S. Ct. at 2391.

*United of Omaha*, 104 F.3d at 1039-40. Thus, several years after *Fabe*, this court applied precisely the same test to the scope of the "savings" clause as it had applied before *Fabe*. Indeed, we can find no decisions of our sister Circuit Courts of Appeals abandoning *Metropolitan Life* in favor of an analysis of the meaning of "business of insurance" under *Fabe* in ERISA "savings" clause cases in the four years, and myriad ERISA preemption cases, since *Fabe* was decided.

---

[8]The Supreme Court did not address the interpretation of the savings clause in its recent ERISA decisions interpreting the preemption clause.

## 2.  *Applicability of the ERISA "savings" clause to the Arkansas PPA*

Contrary to appellants' assertions, we conclude that the district court correctly held that the Arkansas PPA is not "saved" from preemption by the ERISA savings clause.  First, the Arkansas PPA is not a state law that "regulates insurance" under a common-sense approach, *Metropolitan Life Ins. Co.*, 471 U.S. at 740, because it is not a law that is "specifically directed toward that industry." *Pilot Life Ins. Co.*, 481 U.S. at 50; *United of Omaha*, 104 F.3d at 1039.  Rather, as the district court found, it was the intent of the Arkansas General Assembly in enacting the Arkansas PPA "to provide the opportunity of providers to participate in health benefit plans." ARK. CODE ANN. § 23-99-202.  Furthermore, the statutory term "health benefit plans" includes far more than just insurance or the insurance industry, because the Arkansas PPA defines that term to include "any entity or program that provides reimbursement, including capitation, for health care services." ARK. CODE ANN. § 23-99-203(c).  An act that purports to regulate "health benefit plans" defined so broadly as to include employers and administrators of self-insured plans, as well as traditional insurance, simply does not fit within a common-sense view of a law directed specifically toward the insurance industry. *Pilot Life Ins. Co.*, 481 U.S. at 50; *United of Omaha*, 104 F.3d at 1039.  Even if we were to accept appellants' argument that the Arkansas PPA regulates "health care *insurers*," as defined, rather than "health benefit *plans*," it is clear that the statutory term "health care insurers" also goes well beyond the scope of the insurance industry, because it is defined by the statute to include, but not be limited to, insurance companies, hospital and medical services corporations, health maintenance organizations, preferred provider organizations, physician hospital organizations, third-party administrators, and prescription benefit management companies authorized to administer, offer, or provide health benefit plans.  ARK. CODE ANN. § 23-99-203(f).

Again, this scope of the Arkansas PPA must be contrasted with the narrowly drawn act at issue in *Gregoire* upon which the appellants rely. *Compare Gregoire*, ___ F.3d at ___, 1998 WL 318759 at *5 (the Washington law was "specifically directed" toward the insurance industry, "because it operates directly on HMOs and [Health Care Service Contractors], entities engaged in the business of health insurance").

Appellants' argument that the Arkansas PPA has been codified as part of the Arkansas insurance code is unpersuasive, because the law reaches so far beyond the insurance industry. *Cf. Pilot Life Ins. Co.*, 481 U.S. at 50 (even though the Mississippi Supreme Court had identified the state law in question with the insurance industry, "the roots of this law are firmly planted in the general principles of Mississippi tort and contract law."). Furthermore, the Arkansas PPA is not simply an "innovative" insurance law, as appellants contend, citing *Metropolitan Life*, 471 U.S. at 741 (nothing in the "deemer clause" purports to distinguish between "traditional" and "innovative" insurance laws); it is not a law directed at the insurance industry at all, but a law directed at regulation of broadly defined health benefit plans, only some of which fall within the insurance industry.

Nor does the Arkansas PPA satisfy any of the McCarran-Ferguson factors identified in *Metropolitan Life*. First, it plainly does not have the effect of transferring or spreading the policyholder's risk. *Metropolitan Life*, 471 U.S. at 743; *United of Omaha*, 104 F.3d at 1040; *and compare Gregoire*, ___ F.3d at ___, 1998 WL 318759 at *6-*7 (concluding that the Washington act did transfer or spread the policyholder's risk by mandating coverage of additional treatments or conditions). Appellants do not argue to the contrary, asserting instead that failure to meet any one of the McCarran-Ferguson factors is not dispositive. However, the Arkansas PPA also is not an integral part of the policy relationship between the insurer and the insured. *Id.*; *United of*

*Omaha*, 104 F.3d at 1040. If not preempted, it might be an integral part of the relationship between the insurer and a third-party to the insured-insurer relationship, the health care provider. *See* ARK. CODE ANN. § 23-99-206 (making it a violation of the PPA for any provider participation provisions of health benefit plans not to conform to the PPA). As with the Mississippi law in *Pilot Life*, the Arkansas PPA's "connection to the insurer-insured relationship is attenuated at best," because it does not "define the terms of the relationship between the insurer and the insured," but only the terms of the relationship between the insurer and a third party, and hence is "no more 'integral' to the insurer-insured relationship" than any contract an insurer might make with any other third party. *Pilot Life*, 481 U.S. at 50-51; *and compare Gregoire*, ___ F.3d at ___, 1998 WL 318759 at *6 (rejecting the argument that the Washington act regulated only the relationship between the carrier and provider, rather than the relationship between the carrier and the insured, because the Washington act "confers a benefit on insureds by expanding the treatments that their health carriers must provide or pay for," and contrasting this act with "any willing provider" statutes, which "do not expand the conditions covered by the policy, nor . . . expand the types of treatments available under the policy," but only "require[] a health carrier to allow an insured to see any doctor willing to abide by the terms of the insurance plan and willing to provide only those treatments specified in the plan.").

Finally, the Arkansas PPA is not limited to entities within the insurance industry. *Metropolitan Life*, 471 U.S. at 743, 105 S. Ct. at 2391. As noted above, the Arkansas PPA defines "health benefit plans," the terms of which must comply with the PPA, to include "any entity or program that provides reimbursement, including capitation, for health care services." ARK. CODE ANN. § 23-99-203(c). It defines "health care insurers" as including, but not being limited to, insurance companies, hospital and

35

medical services corporations, health maintenance organizations, preferred provider organizations, physician hospital organizations, third-party administrators, and prescription benefit management companies authorized to administer, offer, or provide health benefit plans. ARK. CODE ANN. § 23-99-203(f). An act that purports to regulate "health benefit plans" and "health care insurers" defined so broadly as to include entities well outside the insurance industry plainly is not limited to entities within the insurance industry. *Compare Gregoire*, ___ F.3d at ___, 1998 WL 318759 at \*8 (the Washington Act did not reach entities beyond those in the insurance industry).

Thus, the district court correctly held that the Arkansas PPA is preempted by ERISA under 29 U.S.C. § 1144(a), and is not saved from that preemption under 29 U.S.C. § 1144(b)(2)(A), the ERISA "savings" clause. We believe that this conclusion is compelled by applicable precedent. Although we recognize that various courts have expressed concern about the scope of ERISA preemption, it is for Congress, not the courts, to reassess ERISA in light of modern insurance practices and the national debate over health care. *See, e.g., Kuhl v. Lincoln Nat'l Health Plan of Kansas City, Inc.*, 999 F.2d 298, 304 (8th Cir. 1993) (Judge Beam observed that although it may well be true that Congress had not foreseen certain scenarios "when it enacted a preemption clause so broad that it relieves ERISA-regulated plans of most tort liability . . . modification of ERISA in light of questionable modern insurance practices must be the job of Congress, not the courts"); *accord Bast v. Prudential Ins. Co. of Am.*, ___ F.3d ___, ___, 1998 WL 279217, \*9 (9th Cir. June 2, 1998) (Judge Thompson held that the district court properly concluded that state law claims were preempted by ERISA, remarking, "The Basts' state law claims are preempted by ERISA, and ERISA provides no remedy. Unfortunately, without action by Congress, there is nothing we can do to help the Basts and others who may find themselves in this

36

same unfortunate situation."); *Texas Pharmacy Ass'n v. The Prudential Ins. Co. of Am.*, 105 F.3d 1035, 1039-40 (5th Cir. 1997) (Judge Reavley wrote, "There is room to doubt if ERISA's drafters intended that it would preempt any-willing-provider statutes. We nevertheless conclude that the result in this case is compelled by the unmistakable breadth of ERISA preemption recognized by the Supreme Court. A different result will require further guidance from the Supreme Court or further action from Congress.");*Cannon v. Group Health Serv. of Okla., Inc.*, 77 F.3d 1270, 1271 (10th Cir. 1996) (Judge Porfilio held that claims against an insurer were preempted by ERISA, stating, "Although moved by the tragic circumstances of this case and the seemingly needless loss of life that resulted, we conclude the law gives us no choice but to affirm."); *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 943 (6th Cir. 1995) (Judge Kennedy noted that "[o]ne consequence of ERISA preemption, therefore, is that plan beneficiaries or participants bringing certain types of state actions—such as wrongful death—may be left without a meaningful remedy"); *Turner v. Fallon Community Health Plan, Inc.*, 953 F. Supp. 419, 424 (D. Mass. 1997) (Judge Gorton observed that "[p]laintiff's state common law claims are preempted by the broadly sweeping arm of ERISA. Plaintiff is left without any meaningful remedy even if he were to establish that Fallon wrongfully refused to provide the . . . treatment his wife urgently sought. Notwithstanding the merits of plaintiff's argument, this Court cannot legislate by judicial decree nor apply a statute, such as ERISA, other than as drafted by Congress."); *Pomeroy v. Johns Hopkins Med. Servs., Inc.*, 868 F. Supp. 110, 116 (D. Md. 1994) (Judge Garbis stated, "Ultimately, whether the ERISA civil enforcement provisions must be reexamined and reformed in light of modern health care is an issue which must be addressed and resolved by the legislature rather than the courts.").

### D. *The Extent To Which The Arkansas PPA Is Preempted*

Because we conclude that the Arkansas PPA is preempted by ERISA and not saved by the "savings" clause, we must address the cross-appeal of Prudential Insurance Company of America that the district court erred by amending its grant of summary judgment in favor of appellees to state that the Arkansas PPA is unenforceable only "insofar as" it relates to ERISA plans. Prudential contends that the amendment creates a state statute that was never enacted or considered by the Arkansas legislature. Prudential argues that the "savings" clause requirement that the statute be limited to entities within the insurance industry would be meaningless if the court could simply sever out portions of the statute that applied to non-insurance entities. They contend instead that the Arkansas PPA is preempted in its entirety. The appellants initially agreed that the district court's amended judgment is inadequate, because it begs the question of the extent to which the Arkansas PPA is preempted and does not consider the preemptive effect of other statutes. However, in their reply brief, they contend that the district court properly amended its order in light of severability clauses in both of the acts that became the Arkansas PPA.

As Prudential has asserted, in *Texas Pharmacy Ass'n v. Prudential Ins. Co.*, 105 F.3d 1035 (5th Cir. 1997), *cert. denied*, ___ U.S. ___, 118 S. Ct. 75 (1997), the Fifth Circuit Court of Appeals held that a Texas law containing an "any willing provider" provision was preempted in its entirety by ERISA. *Texas Pharmacy Ass'n*, 105 F.3d at 1039. That court wrote,

> The TPA [Texas Pharmacy Association], in the final footnote of its brief, suggests that if the statute is preempted because it does not apply exclusively to insurers, then we should find preemption only insofar as the statute regulates non-insurers. Stated another way, the TPA suggests that the preempted portions of the statute are severable. We reject

this argument for three reasons. First, [*CIGNA Healthplan of Louisiana v. Louisiana*, 82 F.3d 642 (5th Cir.), *cert. denied*, ___ U.S. ___, 117 S. Ct. 387 (1996),] implicitly rejected this argument. It did not hold the statute valid as to PPOs offered by or affiliated with insurers. Second, our court has recognized as an independent requirement for the applicability of the savings clause that the state statute "be limited to entities within the insurance industry." This requirement would be meaningless if a court could simply sever out those portions of the statute which applied to noninsurance entities.

Third, the Texas statute is not severable because it so states.

*Texas Pharmacy Ass'n*, 105 F.3d at 1039 (footnote citations omitted). They urge us to follow the Fifth Circuit Court of Appeals and hold that the Arkansas PPA is preempted in its entirety, rather than to engage in the process of determining whether PPOs offered by or affiliated with insurers may still be controlled by the Arkansas PPA.

However, as appellants have noted, also citing *Texas Pharmacy Ass'n*, 105 F.3d at 1039, severability is a matter of *state* law. Appellants point out that, unlike the Texas act in *Texas Pharmacy*—which specifically stated that it was *not* severable, *Texas Pharmacy Ass'n*, 105 F.3d at 1039—the two legislative acts that combined to form the Arkansas PPA do contain severability clauses. Those clauses state "[i]n the event any portion of this act is found to be in violation of federal law or in conflict therewith, or held to be unconstitutional, that portion shall hereby be repealed and all other portions of this act shall remain in force." Act 1193 of 1995, § 9; Act 505 of 1995, § 12. Furthermore, these acts provide that "[i]f any provision of this act or the application hereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given effect without

39

the invalid provision or application, and to this end the provisions of this act are declared to be severable." Act 1193 of 1995, § 7; Act 505 of 1995, § 10.

We conclude that, even recognizing the Arkansas General Assembly's intention that the Arkansas PPA be severable, because of the grounds on which we have concluded that the act is preempted by ERISA, it is preempted in its entirety. The Arkansas PPA is not preempted because some discrete portion of it is in "conflict" with federal law or "unconstitutional." *See* Act 1193 of 1995, § 9; Act 505 of 1995, § 12. Nor is preemption here a question of "any provision of this act or any application hereof to any person or circumstance" being "invalid." Act 1193 of 1995, § 7; Act 505 of 1995, § 10. Rather, as explained above, the Arkansas PPA is invalid because the act makes improper references to ERISA. Those references—notably the improper reference that attempts to exclude from the Arkansas PPA "self-funded or other health benefit plans that are exempt from state regulation by virtue of the federal Employee Retirement Income Security Act of 1974, as amended," ARK. CODE ANN. § 23-99-209—permeate and are fundamental to each and every provision of the Arkansas PPA. Thus, there is no severable portion of the Arkansas PPA that can be removed from the act, while other portions are given effect, and the Arkansas PPA is preempted in its entirety. The district court erred in holding to the contrary.

### III. CONCLUSION

Like the district court, we conclude that the Arkansas PPA is preempted, because this state law has an improper "reference to" ERISA or ERISA plans, and the state law is not "saved" from preemption, because it is not a state law that "regulates insurance." Consequently, we affirm the district court's order of January 31, 1997, granting summary judgment in favor of appellees and denying appellants' cross-motion

for summary judgment. However, we reverse the district court's amendment of its judgment in its order of March 14, 1997, which found the Arkansas PPA preempted only "insofar as" it relates to ERISA plans. We hold instead that the Arkansas PPA is preempted in its entirety and that appellees are entitled to injunctive relief permanently enjoining appellants from enforcing the Arkansas PPA in its entirety.

Therefore, the orders of the district court are affirmed in part, reversed in part, and this case is remanded to the district court with directions to enter judgment in accord with this decision.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT